## Case No. 5,949.

### HALL v. UNGER.

[4 Sawy. 672; 2 Abb. (U. S.) 507.] [1]

Circuit Court, D. California. Nov. 8, 1867. [2]

SAN FRANCISCO ALCALDE TITLES — DERANGEMENT ON ONE SUBJECT CONSISTENT WITH CAPACITY TO ACT ON OTHER SUBJECTS—MENTAL CAPACITY TO EXECUTE POWER OF ATTORNEY — PRESUMPTION OF LAW AS TO SANITY — BURDEN OF PROOF — PRESUMPTION OF THE LAW WHERE HABITUAL INSANITY IS SHOWN — INSANITY INFERRED FROM CIRCUMSTANCES—DUTY OF OFFICER TAKING ACKNOWLEDGMENT.

1. The operation of the Van Ness ordinance of the city of San Francisco and the confirmatory legislation of the state of California, and the action of congress, was to give to the holders of San Francisco alcalde grants, such as are mentioned in the ordinance, an absolute and indefeasible estate.

2. The law recognizes the fact that there may be derangement of the mind as to particular subjects, and yet capacity to act on other subjects. In determining, therefore, the ability of a person alleged to be insane to execute any particular act, the inquiry should first be what degree of mental capacity is essential to the proper execution of the act in question, and then whether the party possessed at the time such capacity.

3. For a valid execution of a power of attorney to convey land, it is essential that the party executing the power should at the time possess sufficient mind and memory to understand the nature of the business he is engaged in, to know the character and location of the property, and the object and effect of the act he is doing; in other words, it is essential that he should recollect that he is the owner of the property mentioned, the place where such property is situated, and that the instrument conferred authority for the sale of the same. [See note at end of case.]

4. The law presumes that every adult man is sane, and possessed of the absolute right to sell and dispose of his property in whatever way he may choose; his will, in every case, standing as the reason of his conduct. Whoever denies his sanity must establish the position; the burden of proof rests upon the party who alleges the mental derangement. If the validity of a particular act is assailed, the assailant must establish that at the time the act was done the insanity existed.

5. The fact of the existence of a prior or subsequent lunacy, except where it is habitual, does not suffice to change the burden of proof. The case is, however, otherwise, where such habitual insanity is shown to have existed; then the presumption is that the party was insane at the time, and the burden of proof rests with those who allege the party's competency. [Cited in Parkhurst v. Hosford, 21 Fed. 833.]

6. In considering whether a particular act assailed for the alleged insanity of the party was valid or not, regard must be had, in the absence of direct testimony on the point to all the attending circumstances, the reasonableness of the act in itself, and its approval by the family and relations of the party.

7. It is the duty of an officer authorized to take the acknowledgment of an instrument to satisfy himself, before he signs his certificate, of the competency of the party to execute the instrument, and the presumption of capacity is therefore strengthened by the attestation of the officer.

This was an action to recover possession of lands. It was originally commenced by Mary K. Hall, who was the widow, and four other plaintiffs, who were the children of John Hall, deceased; from whom the plaintiffs claimed to inherit the premises in question. Mary K. Hall died during the proceedings, after which the action was prosecuted by the other plaintiffs. The action was originally brought against Adolph Unger, and seventeen other defendants; but the plaintiffs discontinued against Unger and several other defendants, and prosecuted the action against Henry S. Dexter and six others. [3] The leading question of general interest—

1 [Reported by L. S. B. Sawyer, Esq., and by Benjamin Vaughan Abbott, Esq., and here compiled and reprinted by permission. The syllabus and opinion are from 4 Sawy. 672, and the statement is from 2 Abb. (U. S.) 507.]

2 [Affirmed in 15 Wall. (82 U. S.) 9.]

3 Notwithstanding the change of parties, the action was known, throughout proceedings in

est, presented upon the trial, related to the mental capacity of John Hall to execute a certain power of attorney. The facts, so far as are necessary to present this question, were as follows: The land in question was a lot situated upon Bryant-street, in San Francisco. The plaintiffs claimed it as heirs of John Hall; and they proved a grant of the land to Hall from an alcalde in San Francisco, and subsequently confirmed by the legislation of the state and of the United States, which vested the title in him; the relationship of the plaintiffs to Hall; his death; the possession of the lands by the defendants, and other facts requisite to make out a presumptive right to recover. To meet the case thus presented, the defendants gave in evidence a power of attorney, purporting to be executed by John Hall, on December 27, 1852, to one James W. Harris, empowering him to sell and convey the real property in controversy, and also to appoint a substitute to act for him. This power bore a certificate of due acknowledgment before a commissioner of California, resident in Pennsylvania. They also produced a substitution of the power to one David B. Rising, and a conveyance of the premises by Rising, acting under this substitution, to Daniel D. Page, under whom they claimed title. This power of attorney, and the acts done under it, the plaintiffs assailed, contending that, at the time it purported to have been executed, Hall was insane, and incapable, by reason of his insanity, from attending to any business. Many witnesses were examined upon this question; but the recapitulation of their testimony given in the judge's charge is sufficient to explain his general instructions.

Hall, McAllister & Galpin, for plaintiffs.

J. P. Hoge and Sol. A. Sharp, for defendants.

FIELD, Circuit Justice (charging jury). This is an action of ejectment to recover the possession of a 100-vara lot, situated on the northerly side of Bryant street, near First street, in this city. The plaintiffs claim the property as the heirs of John Hall, deceased. In support of their claim they have produced a grant of the premises issued to Hall by Alcalde Leavenworth, on the thirtieth of December, 1848, and have proved its genuineness and due execution; they have shown the marriage of Hall with their mother, Mary K. Hall, and that they are the children of this marriage. John Hall died in September, 1860, and Mary K. Hall has died during the pendency of the present action. At the death of their father the plaintiffs were all minors, the eldest being twenty years, and the youngest nine years of age. The property granted, assuming that the grant was valid,

was the separate property of Hall, and by the law of descents and distributions of this state whatever interest he then possessed passed upon his death, one-third to his surviving wife, and the remainder in equal shares to the children. On the death of the wife her interest also went to the children, so that now the entire estate which he possessed in this property at his decease, assuming that he possessed any, is vested in the plaintiffs.

It is not necessary to consider whether originally American alcaldes in the city of San Francisco, after the cession of California to the United States, possessed any power to make grants of land. So far as this case is concerned it is immaterial whether they did or did not possess such power. The subsequent action of the authorities of the city of San Francisco, and the confirmatory legislation of the state, together with the action of congress, have given to the holders under alcalde grants, recorded like the one in suit, an absolute and indefeasible estate, even if they acquired originally no title whatever by the grants.

By the ordinance of the common council of the city of San Francisco, commonly designated, from the name of its reputed author, the "Van Ness Ordinance," the city relinquished and granted all her right and claim to the lands within her corporate limits, as defined by the charter of 1851, to the parties in the actual possession thereof, by themselves or tenants, on or before the first day of January, A. D. 1855, provided such possession was continued up to the time of the introduction of the ordinance into the common council, or, if interrupted by an intruder or trespasser, had been or might be recovered by legal process; but at the same time the ordinance declared that all persons who held title to lands within said charter limits, lying east of Larkin street and north-east of Johnson street, by virtue of any grant made by any ayuntamiento, town council, or alcalde of the pueblo, after the seventh of July, 1846, and before the incorporation of the city, which grant, or the material portion thereof, was registered or recorded in a proper book of records—deposited in the office or custody or control of the recorder of the county of San Francisco—on or before April 3, 1850, should for all the purposes contemplated by the ordinance "be decreed to be possessors of the land" granted, although the land might be in the actual occupancy of persons holding the same adverse to the grantees. In other words, the ordinance declared that the title of the city, whatever it may have been, should go to the parties in actual possession at a designated period, and that the holders under alcalde grants, which were, previous to April 3, 1850, registered or noted in books deposited in the recorder's office, should be deemed such possessors for the purposes of the ordinance.

In this case it has been shown that the

---

the circuit court, as Hall v. Unger. But subsequent proceedings on error were instituted under the title Dexter v. Hall [15 Wall. (82 U. S.) 9.]

grant was registered in a proper book at the time or soon after its execution, in 1848, and that this book was deposited in the office of the recorder on its establishment in April, 1850. The Van Ness ordinance did, therefore, if it were valid, transfer to and vest in John Hall (had he not previously disposed of the premises) all the right and title of the city. But lest the action of the common council, in passing this ordinance, might have been in excess of their authority, application was made to the legislature of the state for its confirmation, and on the eleventh of March, 1858, the legislature ratified and confirmed it.

But notwithstanding this legislation, there were numerous persons—some of them among our ablest lawyers—who denied that there was any title in the city which she could relinquish, and insisted that all the lands within the corporate limits belonged to the United States. The framers of the ordinance also appear to have entertained some doubts on this subject, for they provided in the tenth section that application should be made, not merely to the legislature of the state for confirmation, but to congress, "to relinquish all the right and title of the United States to the said lands for the uses and purposes" mentioned in the ordinance.

Affected by similar doubts, and in order to give quiet and security to the parties holding under the Van Ness ordinance, one of our senators introduced a bill into congress containing a clause relating to these lands. The bill became a law on the first of July, 1864, and by it all the right and title of the United States to lands within the corporate limits of the city, as defined by the charter of 1851, with certain reservations not material to this case, were ceded to the city and its successors for the uses and purposes specified in the Van Ness ordinance.

Thus, gentlemen, you will perceive that all the possible sources of title of lands, namely, the city as successor to the pueblo, the state, and the United States, have united to vest an absolute and indefeasible estate in the claimant under the alcalde grant in question. The defendants being in possession of the premises when this action was instituted, the case of the plaintiff is thus prima facie made. To meet the case thus presented, the defendants have produced and given in evidence a power of attorney, purporting to be executed by John Hall, on the twenty-seventh of December, 1852, to one James W. Harris, empowering him to sell and convey the real property in controversy, and also to appoint a substitute to act for him. This power bears a certificate of due acknowledgment before a commissioner of California, resident in Pennsylvania. They have also produced a substitution of the power to one David B. Rising, and a conveyance of the premises by Rising, acting under this substitution, to Daniel D. Page, under whom they claim. This power the plaintiffs assail, contending that, at the time it purports to have been executed, Hall was insane, and incapable, by reason of his insanity, from attending to any business.

Gentlemen:—I do not propose to attempt any nice or philosophical exposition of the subject of insanity. I should certainly fail if I made the attempt; and if I could succeed, the result would not be of any service to you in determining this case. Any elaborate and extended dissertation, if it were possible for me to present such a one, would only tend to perplex and confuse your minds. I shall make a few observations on the subject, and refer to the rules laid down by the authorities to guide you in considering it, and then call your attention briefly to the evidence in the case.

The physicians who have been examined, and the text writers, declare that it is impossible to give any consistent definition of insanity; that no words can comprise the different forms and characters which this malady may assume. The most common forms in which it presents itself, are those of mania, monomania, and dementia. All these imply a derangement of the faculties of the mind from their normal or natural condition. Idiocy, which is usually classed under the general designation of insanity, is more properly the absence of mind than the derangement of its faculties; it is congenital, that is, existing in birth, and consists not in the loss or derangement of the mental powers, but in the destitution of powers never possessed.

Mania is that form of insanity where the mental derangement is accompanied with more or less of excitement. Sometimes the excitement amounts to a fury. The individual in such cases is subject to hallucinations and illusions. He is impressed with the reality of events which have never occurred, and of things which do not exist, and acts more or less in conformity with his belief in these particulars. The mania may be general, and affect all or most of the operations of the mind; or it may be partial, and be confined to particular subjects. In the latter case it is generally termed monomania.

Dementia is that form of insanity where the mental derangement is accompanied with a general enfeeblement of the faculties. It is characterized by forgetfulness, inability to follow any train of thought, and indifference to passing events. "In dementia," says Ray, a celebrated writer on medical jurisprudence, "the mind is susceptible of only feeble and transitory impressions, and manifests but little reflection even upon these. They come and go without leaving any trace of their presence behind them. The attention is incapable of more than a momentary effort, one idea succeeding another with but little connection or coherence. The mind has lost the power of comparison, and abstract ideas are utterly beyond its grasp. The memory is peculiarly weak; events the most recent and most

nearly connected with the individual being rapidly forgotten. The language of the demented is not only incoherent, but they are much inclined to repeat insulated words and phrases without the slightest meaning."

These common forms of insanity, mania, monomania, and dementia, present themselves in an infinite variety of ways, seldom exhibiting themselves in any two cases exactly in the same manner. Mania sometimes affects, as already observed, all the operations of the mind; and sometimes the mental derangement appears to be limited to particular subjects. An absence of reason on one matter, indeed, on many matters, may exist, and at the same time the patient may exhibit a high degree of intelligence and wisdom on other matters. The books are full of such cases. Many of them have been cited to you by counsel on the argument. They show, indeed, a want of entire soundness of mind; they show partial insanity; but this does not necessarily unfit the individuals affected for the transaction of business on all subjects. In a case which arose in the prerogative court of England (Dew v. Clark, 3 Addams, Ecc. 79), it was said by counsel that partial insanity was something unknown to the law of England. To this suggestion the court replied: "If he meant by this that the law of England never deems a person both sane and insane at the same time upon one and the same subject, the assertion is a mere truism. But if by that position it be meant and intended that the law of England never deems a party both sane and insane at different times on the same subject, and both sane and insane at the same time on different subjects, there can scarcely be a position more destitute of legal foundation, or rather there can scarcely be one more adverse to the current of legal authority." In that case the court cited the language of Locke, that "a man who is very sober and of right understanding in all other things, may, in one particular, be as frantic as any man in Bedlam;" and of Lord Hale, who says, "There is a partial insanity of mind and a total insanity; in the first, as it respects particular things or persons. or in respect of degrees, which is the condition with very many, especially melancholy persons, who for the most part discover their defect in excessive fears and grief, and yet are not wholly destitute of the use of reason."

So, too, in dementia, where there is a general enfeeblement of the mental powers, there is not usually equal weakness exhibited on all subjects, nor in all the faculties. Those matters which, previous to the existence of the malady, the patient frequently thought of and turned over in his mind, are generally retained with greater clearness than less familiar objects. One faculty may be greatly impaired,—the memory, for example,—while other faculties retain some portion of their original vigor.

The disease is of all degrees, from slight weakness to absolute loss of reason. The enfeeblement usually progresses gradually—through a twilight, as it were, of reason, before the darkness of night settles upon the mind.

It is important to bear these observations in mind; for it does not follow from the fact that mania or dementia be shown, that there may not be reason or capacity for business on some subjects. In determining the ability of the alleged insane person to execute any particular act, the inquiry should first be, what degree of mental capacity is essential to the proper execution of the act in question; and then whether such capacity was possessed at the time by the party. It is evident that a very different degree of capacity is required for the execution of a complicated contract, and a single transaction of a simple character, like the purchase or sale of a lot.

The act done in the case at bar was the execution of a power of attorney to sell three lots in San Francisco. The act required no greater exercise of reason than is essential to the valid execution of a will of real property; and the authorities which determine the degree of capacity essential in such cases may properly be relied upon as furnishing the proper rule in this case. And those authorities concur, especially the later authorities, substantially in this; that it is only necessary to the validity of the will that the testator had sufficient mind and memory to understand the business upon which he was engaged, and the effect of the act he was doing. "He must," in the language of Judge Washington, in Harrison v. Rowan [Case No. 6,141], "have a sound and disposing mind and memory. In other words, he ought to be capable of making his will, with an understanding of the nature of the business in which he is engaged —a recollection of the property he means to dispose of—of the persons who are the objects of his bounty, and the manner in which it is to be distributed between them. It is not necessary that he should view his will with the eye of a lawyer, and comprehend its provisions in their legal forms. It is sufficient if he has such a mind and memory as will enable him to understand the elements of which it is composed—the distribution of his property in its simple forms. It is the business of the testator to dictate the purposes of his mind, and of the scrivener to express them in legal form."

It is true, as stated by counsel, that the authorities generally go to the extent that it requires less intelligence and reason to make a will than to execute a contract; but for the execution of an act of a simple character, not involving complicated details and provisions, the rule laid down by Judge Washington is sufficiently stringent.

According to that rule, it was material to the valid execution of the power in this case,

that Hall should, at the time, have possessed sufficient mind and memory to understand the nature of the business he was engaged in, to know the character and location of the property, and the object and effect of the act he was doing; in other words, it was essential that he should recollect that he was the owner of the property mentioned, that such property was situated in the city of San Francisco, and that the instrument conferred authority for the sale of the same.

In considering this case, it is to be remembered that the law presumes that every adult man is sane, and possessed of the absolute right to sell and dispose of his property in whatever way he may choose; his will in every case standing as the reason of his conduct. Whoever denies his sanity must establish the position; the burden of proof rests upon the party who alleges the mental derangement. And if, as in the present case, the validity of a particular act is assailed, the assailant must establish that at the time the act was done the insanity existed. Testimony as to previous or subsequent insanity will not answer. unless the insanity be shown to be habitual—that is, such as is in its nature continuous and chronic. The fact of the existence of a prior or subsequent lunacy, except where it is habitual, does not suffice to change the burden of proof. The case is, however, otherwise, when such habitual insanity is shown to have existed; then the presumption is that the party was insane at the time, and the burden of proof rests with those who allege the party's competency.

Again, in considering whether a particular act assailed for the alleged insanity of the party was valid or not, regard must be had, in the absence of direct testimony on the point, to all the attending circumstances—the reasonableness of the act in itself, and its approval by the family and relations of the party. The reasonableness of the act and the approval of the family will not render the act valid, if the party were at the same time insane, but they are circumstances tending to show that the party was not at the time incompetent, and that his family and relatives did not so regard and treat him.

In this case it appears that the lot in controversy was at the time in the adverse possession of others, and that the supreme court of the state had decided that alcalde grants conferred no title. A sale of his interest, if anything could be obtained for it, under the circumstances, would seem to have been a judicious and a wise step.

The only testimony which relates directly to the time of the execution of the power is that of Broadhead, the witness to the instrument, and the officer before whom it was acknowledged. It was the duty of this officer to satisfy himself of the competency of Hall before attesting the instrument. As

said by the supreme court of Pennsylvania, in Werstler v. Custer, 46 Pa. St. 503, "No honest man will subscribe as a witness to a will or any other instrument executed by an insane man, an imbecile, an idiot, or a person manifestly incompetent for any reason to perform, with legal effect, the act in question. A duty attaches to the witness to satisfy himself of the competency of the party before he lends his name to attest the act. Like the magistrate who takes the acknowledgment of a deed, he is to be reasonably assured of the facts he undertakes to verify, else he makes himself instrumental in a fraud upon the public. And, therefore, the legal presumption, always favorable to competency, is greatly strengthened by the fact of attestation by witnesses."

Such is the general effect of the attestation of a witness and officer; but whether the attestation in the present case, under the peculiar circumstances in which it was made, can add anything to the legal presumption of competency, may well be doubted. It is a circumstance worthy of consideration, whether the commissioner should have gone to the asylum to take the acknowledgment of an inmate of the institution, with whom he had no previous acquaintance, without information from the officers of the institution that the patient at the time was in possession of sufficient reason to understand the business which it was proposed he should execute.

Broadhead testifies that he went to the Frankfort Asylum to take the acknowledgment of Hall, with whom he was not previously acquainted; that he read the power to Hall, and handed it to him to read, and asked him if he understood it; that Hall replied "perfectly," or words to that effect; and that the property was valuable, and that he wanted it sold for the benefit of his wife and children. The commissioner also testifies, that he could not have believed Hall was on all subjects of sound mind, from the simple fact that he was an inmate of the asylum; but that, as to the power of attorney, Hall was clear as to what he was giving; that there was nothing in his appearance which led the commissioner to suppose he was insane, and from the fact that he stated that he wanted the property to be sold, the commissioner was led to believe he had a lucid interval. The witness adds, that he would not have permitted Hall to execute the instrument, and he would not himself have taken the acknowledgment, unless Hall had been of sufficient mind, memory, judgment, and understanding, to execute such a paper.

Aside from the peculiar circumstances under which the commissioner acted, there is one fact in his testimony which should be considered by you as throwing possibly some light on the condition of Hall's mind, at the time, somewhat in conflict with the commissioner's own opinion. He states that Hall

at first wrote something besides his signature to the instrument. The instrument itself shows that there has been an erasure of something near the signature. The commissioner states, as his impression, that Hall wrote some other name than his own. This is at least a singular circumstance, if, as stated by the commissioner, he had heard the instrument read, and perfectly understood its purport.

We will now briefly refer to the testimony produced by the plaintiffs, to show the general insanity of Hall at the time he executed the power in question. If he was then insane, and his insanity was general, the instrument was a nullity, and no title could be transferred under it. In that case the plaintiffs are entitled to a verdict. It matters not, if such were the case, what consideration may have been paid to the attorney, or with what good faith the parties may have purchased. The instrument, in such case, is no more to be regarded as the act of John Hall than if he was dead at the time of its execution.

It appears from the testimony produced by the plaintiffs, that John Hall was a lieutenant in the United States navy, and at one time had the command of a vessel of war; that he was, in 1848, on this coast; that whilst here, the alcalde grant was issued to him; that in 1849, he became unwell, and his health was so much affected that he was sent to the eastern states under the charge of a physician; that he arrived in New York and joined his family in June, 1849; that he remained with his family until June, 1851—two years; that during this period, there were such indications of insanity that, upon the advice of his consulting and family physicians, he was sent to the asylum at Frankfort; that he remained there, under treatment for insanity, until January 25, 1854, when he was removed to the state insane asylum; and that he died an inmate of this latter institution, in September, 1860.

The witnesses produced by the plaintiffs are either the physicians attending, or persons immediately surrounding Hall, both before his entry into the asylum and afterwards. The testimony discloses the possession by him of hallucinations and illusions on many subjects. Mr. Wright states, that whilst in New Jersey, after his return, he was at times greatly incensed at his neighbors, asserting that they had destroyed his garden—which they had not—and complained of noises in his ears, which he said arose from a train of cars running through his head.

Miss Harris testified that he was subject to fits of abstraction; had strange fancies; thought he had been to heaven, and said so, and finding his wife was not there, had returned; that he complained much of confusion in his head, and thought trains of cars were running through it; and would object to a light in the evening, as being painful to his head and setting it on fire; that he would work in his garden sometimes for a whole day without food, giving as an excuse that he was obliged to work for his living; that he would plant vegetables and flowers and soon dig them up, and then charge his neighbors with killing his plants; he would get excited and threaten to shoot any one who came on his place; that there was a spring of water in the cellar, which was drained through a vacant lot, and that he at one time took a fancy to fill up the drain, and then, when the water rose, he spent hours in trying to bail it out. He did this repeatedly. He would fill up the drain in the daytime, and his wife would hire a man to open it after night. When remonstrated with for his conduct, he said it was God's will it should be done. He would sometimes fancy himself the Creator, and want parties to address him as such; at other times he would use the most blasphemous language. He would buy the most unnecessary things, posts and rails, for which he had no use. He took great dislike to certain persons, and would not permit them to come to the house. He would sometimes sit at the table, with a vacant stare, and neither eat himself or help others. He took no notice of his children and no care of his family, although before that he was a devoted husband and affectionate to his children. At times he would treat visitors very insolently, fancying they came to injure him. He would expose himself all day to the hot sun, and if called in, he would say he was too busy, and obliged to work. He fancied he owned everything he saw at the stores, and could not understand why he could not help himself to what he liked.

After Hall was sent to the asylum, it appears he continued subject to hallucinations. Wright testifies that it was impossible to hold any connected conversation with him, or to keep his mind centered on any one subject; that he fancied his fellow patients were distinguished historical characters, and desired to introduce them to the witness. He had scars upon his wrists and arms, and said he had been tattooing himself, a beautiful art he had acquired at the Sandwich Islands, and desired to tattoo the witness, stating that the operation was perfectly painless. Miss Harris states that when she visited him at the asylum, he imagined he was employed to fit out a fleet, and said he was oppressed with care he was so occupied with his business.

Wistar, the steward at Frankfort Asylum, from May, 1852, to September, 1853, testifies that Hall had a great many singular propensities. When awake he spent a great deal of his time in indistinct mutterings and murmurings. He had a propensity for weaving wire and fish bones into his arms and legs, through the flesh and under the skin, very much as a woman would darn a stocking. This resulted in sores, which fes-

tered and discharged. He was in the habit of heaping up his bed-clothes in his bed daily in the form of a hay-cock or pyramid, and would then cap the same with the chamber utensil. He had a fancy of putting on his clothing in a way not designed to be worn. He tore his clothing and bedding. He was very profane and obscene in his language, and spent a good deal of time in what he termed prayer, which in a sane man would have been blasphemy of the worst kind. The testimony of Mrs. Wistar is to the same effect.

Dr. Fithian, the family physician of Hall from June, 1849, until he went to the hospital, pronounces his malady insanity, and says that it was accompanied with unnatural excitement, restlessness, irritability; that he was incoherent, and had want of connection of thought and expression. He adds that the disease was acute mania, rather than dementia, into which acute mania is apt to run.

Dr. Evans, who was one of the physicians of Hall, both before and after he was at the asylum, states as his recollection of the disease, that he was laboring under chronic inflammation of the meninges of the brain, producing mania, and resulting in dementia, and that whilst at the asylum he gradually deteriorated and grew worse, and that he (the doctor) considered him hopelessly insane.

Dr. Worthington, the medical superintendent, pronounces the disease of Hall mania, with a tendency to dementia, and states that he had various delusions, and among others, believed he was the Son of God. I have stated the most important matters testified to by the witnesses, from which you must draw your conclusions as to the sanity or insanity of Hall at the time the power was executed. I do not refer to the testimony as to Hall's condition after his removal from the asylum at Frankfort to the state asylum. It is not pretended that after that period he was possessed of lucid intervals, but, on the contrary, he gradually sank from one degree of weakness to another until his death.

You will perceive that the physicians of Hall state that the malady of which he was suffering was originally acute mania, and that it ended in dementia. You will observe that he was affected by similar hallucinations and illusions, both before and after he went to the asylum; and you will remember, as already stated, in speaking of mania, that it is characterized by hallucinations or delusions; the patient believing and acting upon the supposed reality of facts and events which have never occurred, or do not exist. The testimony of all the witnesses is that the malady from the commencement continually increased, the patient gradually sinking from one degree of enfeeblement to another. Now, there may have been lucid intervals with the patient arising from an intermission in the operation of the disease. If there was any such intermission and consequent lucid interval in this case, it is for you to determine. In considering this matter, you will remember that the malady in this case arose from a disease of the lining membrane of the brain, from what Dr. Evans designates chronic inflammation of the meninges of the brain; that it had continued with more or less intensity for over three years when the power of attorney was executed. If, therefore, you should come to the conclusion that he was, as asserted by his physicians, insane before he entered the asylum, and that his malady continued to grow worse afterward, you will be justified in finding that it had attained that character which the books designate as habitual insanity, which is continued and settled derangement. If you come to this conclusion, you will then look for proof of his having had a lucid interval when he executed the power.' The burden of proof, in that event, that is to say, if habitual insanity be established, lies upon the party who alleges that a lucid interval existed.

Several very able physicians in this city have been called to state their opinions founded upon the evidence of the plaintiffs—that of Broadhead being excluded—as to the probability of lucid intervals in the condition in which Hall is shown to have been. They all express the opinion that such lucid intervals were probable; indeed, their testimony goes so far as to state that in their judgment his insanity was not, previous to 1853, of such severe and general character as to render him at all times incapable of transacting business on some subjects.

I will only observe, that the opinions of physicians are received in evidence from their superior knowledge of matters connected with their profession. It would be difficult to present in an intelligible way to a jury all the grounds upon which learned professional men may base their judgments. The law, therefore, allows their opinions to be received, but at the same time, where professional men are of equal standing and intelligence, it awards much higher consideration to those opinions which are based upon personal observation and examination of the patient.

The case, gentlemen, is one of great interest, and is of much importance to the parties. It has been tried with great ability by counsel, and I doubt not that after the patient consideration which you have given to their arguments and to the evidence, you will, under the instructions of the court, readily reach a wise and just verdict.

The jury returned a verdict for plaintiffs and judgment was entered accordingly in their favor. Afterward defendants sued out a writ of error, and the case was taken to the United States supreme court, where the judgment was affirmed. It will be found reported under the title of Dexter v. Hall, 15 Wall. [82 U. S.] 9.

[NOTE. The defendants then brought error, and the supreme court affirmed the judgment

in an opinion by Mr. Justice Strong, who held that the power of attorney of a lunatic or of one non compos mentis was void. 15 Wall. (82 U. S.) 9.

[The mandate having been filed in circuit court, and a writ of possession issued, the marshal refused to execute it, because the person in possession claimed title under a tax sale subsequent to judgment. Mr. Justice Field held that the marshal might require security from plaintiff, or give time to defendant to apply to the court for a modification of the writ so as to exclude him. When such security is tendered, and no application is made, the duty of the marshal is to put the plaintiff in possession. Case No. 5,929.]