TILLIE BROZ, ADMINISTRATRIX, APPELLEE, V. OMAHA MATERNITY & GENERAL HOSPITAL ASSOCIATION, APPELLANT.

FILED JULY 14, 1914. No. 17,583.

1. **Evidence:** MORTALITY TABLES. As data or evidence tending to show expectancy of life, mortality tables are not conclusive, but they are competent to aid the jury in determining the probable duration of life, when that question is in issue, and may properly be submitted with other evidence.

2. **Trial:** MORTALITY TABLES: PROBATIVE EFFECT: QUESTION FOR JURY. The probative effect of mortality tables, if any, is a question for

Broz v. Omaha Maternity & General Hospital Ass'n.

the jury, but proof of the good health of the person whose expectancy of life is under consideration is not essential to their admissibility.

3. **Evidence:** MORTALITY TABLES: ADMISSIBILITY. Proof of disease or of ill health or of hazardous employment may impair or destroy the effect of mortality tables as evidence, but does not make them inadmissible.

4. ———: ADMISSIONS. Where the head nurse of, a hospital, while in the performance of her duties, is asked how a patient got poison, from the effects of which he is suffering, and refers the inquirer to the patient, with directions to go to his room and ask ''how and where he got it and what it was,'' and afterward assents to statements by the patient, in answering those questions, that he got the poison in his room and took it thinking it was medicine, when promptly repeated to the nurse by the inquirer, who followed her directions, the statements may be admitted in evidence as admissions or declarations tending to prove negligence on the part of the hospital.

5. **Hospitals:** NEGLIGENCE OF EMPLOYEES: LIABILITY. A hospital conducted for private gain is liable to a patient for the negligence of nurses, while acting within the scope of their employment.

6. **Physicians and Surgeons:** NEGLIGENCE OF HOSPITAL EMPLOYEES: LIABILITY OF PHYSICIAN. Where a patient in a hospital is treated by a physician who does not manage or control the hospital, he is not liable for the negligence of hospital nurses or internes, if he had no connection with any negligent act.

7. **Hospitals:** IMPLIED OBLIGATIONS. A patient is generally admitted to a hospital, conducted for private gain, under an implied obligation that he shall receive such reasonable care and attention for his safety as his mental and physical condition, if known, may require. *Wetzel v. Omaha Maternity & General Hospital Ass'n, ante,* p. 636.

8. **Evidence:** PRESUMPTIONS: TEMPORARY AILMENT. A mere fitful or temporary mental disorder will not be presumed to continue.

9. **Hospitals:** NEGLIGENCE: QUESTION FOR JURY. Whether a hospital was negligent in allowing a patient, while suffering from a fitful, mental disorder, access to a sinkroom, in the night, without an attendant, where poison was kept, *held* a question for the jury.

APPEAL from the district court for Douglas county: GEORGE A. DAY, JUDGE. *Affirmed.*

*William Baird & Sons* and *E. M. Morsman, Jr.,* for appellant.

*Duncan M. Vinsonhaler* and *W. C. Fraser, contra.*

ROSE, J.

This is an action to recover $40,000 for alleged negligence resulting in the death of Adolph F. Broz, a farmer who, with his wife and two children, had resided on a farm in Saline county. Plaintiff is the administratrix of his estate. The Omaha Maternity & General Hospital Association, defendant, is a corporation conducting at Omaha a hospital for private gain. Broz was a patient therein from April 18, 1910, until June 21, 1910, paying for his room and care $15 a week. In the petition it is alleged that Broz was knowingly admitted as a patient when suffering from a mental disorder which caused at times a delirious condition impelling him intermittently to leave his bed and otherwise to act irrationally; that while a patient of defendant he took poison, the result being fatal; that defendant was negligent in permitting him to remain for a long time unattended and unguarded in his room and in the hallways of the hospital, and in negligently leaving in an exposed and unguarded place the poison which he took; that, after defendant was apprised that he had taken poison, it negligently failed to administer proper remedies and antidotes; that the facts pleaded constitute a negligent omission of duty and a breach of defendant's implied undertaking to furnish and supply him with all the care, nursing, medical treatment and oversight necessary, suitable and proper for him in view of his known physical and mental condition. In its answer defendant denied negligence, but admitted that Broz was affected with a mental disorder when taken to the hospital; that about midnight June 19, 1910, he was found in his room dangerously ill, and nurses then on duty were soon afterward apprised that he had taken poison; that he died June 21, 1910. The jury rendered a verdict in favor of plaintiff for $7,000. From a judgment for that sum defendant has appealed.

The first assignment of error is directed to the admission in evidence of standard tables of expectancy of life. On this point defendant says: "As a matter of fact Broz

was suffering from a mental disorder of such a nature that he could never fully recover, and his chances of a partial recovery were none too good. The probable duration of the life of a person in such a condition is very uncertain and cannot be shown by the introduction in evidence of the ordinary life tables, for those tables are applicable only to persons in good health." In support of this argument, *City of Lincoln v. Smith*, 28 Neb. 762, and *Roose v. Perkins*, 9 Neb. 304, are cited. The question now presented was not involved in either of those cases. While good health was shown, neither opinion contains the statement that mortality tables are inadmissible in absence of proof of that fact. As data or evidence, tending to show expectancy of life, mortality tables are not conclusive. *City of Friend v. Ingersoll*, 39 Neb. 717; *Vicksburg & M. R. Co. v. Putnam*, 118 U. S. 545; *City of Joliet v. Blower*, 155 Ill. 414; *Central R. Co. v. Crosby*, 74 Ga. 737; *Scheffler v. Minneapolis & St. L. R. Co.*, 32 Minn. 518. They are competent evidence to aid the jury or court in determining the probable duration of life when that question is in issue, and may properly be submitted with other evidence, showing health, age, existence of disease, physical and mental condition, vocation or employment, and other pertinent facts.

As evidence, the effect of mortality tables, if any, is determinable by the triers of fact. *City of Friend v. Ingersoll*, 39 Neb. 717; *City of South Omaha v. Sutliffe*, 72 Neb. 746. Proof that the person whose expectancy of life is under consideration conforms to the standards of health and vigor adopted in compiling mortality tables is not essential to their admissibility.

Evidence of disease or of ill health or of hazardous employment may impair or destroy the probative effect of tables of expectancy of life, but it does not make them inadmissible. *Arkansas M. R. Co. v. Griffith*, 63 Ark. 491; *Greer v. Louisville & N. R. Co.*, 94 Ky. 169; *Birmingham M. R. Co. v. Wilmer*, 97 Ala. 165; *Mary Lee Coal & R. Co. v. Chambliss*, 97 Ala. 171; *Coates v. Burlington, C. R.*

& N. R. Co., 62 Ia. 486. In the *Arkansas* case cited the court said: "The question is whether we can still make the tables of service in making the calculation, notwithstanding it is shown that plaintiff's condition and health were below the average, and that, in fact, he was not an insurable risk. This is an element of uncertainty that must necessarily be found in the case of one of feeble health and not insurable, in all cases, whether we call to our aid the mortality tables or not. When we do so, however, when, by reason of enfeebled physical condition, the standard tables are not strictly applicable on that account, yet they are more or less efficient aids in arriving at an approximation of the truth, and that is the best that can be hoped for after all." This assignment of error is therefore overruled.

Another assignment of error challenges the admissibility of statements by Broz that the poison was on a table in his room, and that he took it, thinking it was his medicine. Over objections of defendant, statements of this nature were proved by Dr. Mares. There is testimony tending to show: Dr. Mares was a brother-in-law of Broz. The poisoning was discovered before midnight. About 8 o'clock the next morning Dr. Mares was notified, and promptly went to the hospital. Upon his arrival he conversed with the head nurse. He testified: "I asked the head nurse what happened, and she told me that Mr. Broz took poison, and that it was bichloride of mercury. I asked her how could she tell it was bichloride of mercury, and she told me she could tell by the symptoms; and I asked her, 'How did he get it?' She told me to go in his room and ask how and where he got it and what it was." Dr. Mares went to the room of the patient, interviewed him, and reported the conversation to the head nurse, who said: "That is what I thought." The statements of Adolph F. Broz were thus reported by Dr. Mares in his own language, as follows: "When I came in the room I said, 'Adolph, what did you do, and what did you do it for?' and he said, 'I did not do anything.' He said, 'I

took four tablets off of the tray on the table.' He pointed at the table, and he said he thought it was his medicine, and I asked him what kind they were, and he said they were blue in color, and a little smaller than usual. And then he told me that he took them because lately they were changing medicine on him, and so he thought it was his medicine, and I asked him if he used to take so many, and he said, no, he only took two, and sometimes only one, and those were grayish in color and a little bit larger. And then he also told me that he drank a glass full of something that tasted oily. I asked him, 'Did it make you sick?' and he said, 'No, not right away,' but in a few minutes he started to get cramps and pains in his stomach and started to vomit."

The question is: Did the trial court err in admitting this testimony and other proof of a similar nature? It is argued that defendant is not bound by such statements; that Broz was under the care of his own physician, and that the latter's instructions were obeyed by the nurses and other employees of the hospital; that Broz, under specific directions of his physician, was allowed the freedom of his room and of the halls in the hospital; that bichloride of mercury was used in the hospital as an indispensable disinfectant, and that it was kept for that purpose in a sinkroom, where Broz found the tablets; that he took the poison with suicidal intent, there being at the time no reason to suspect that he would do so. Defendant adduced proof in support of the positions thus taken. If, however, the statements of Broz were properly admitted, there is evidence of negligence on the part of defendant. Intermittent mental infirmities of the patient were pleaded in the petition and admitted in the answer. The pleadings, evidence and circumstances justify a finding that he was admitted to the hospital under an implied obligation that he should receive such reasonable care and attention for his safety as his mental and physical condition required. The physician employed by him did not relieve the hospital of responsibilty for negligence on its part, if any. The patient was under the personal obser-

ration of his physician only a small portion of the time. In the latter's absence and during emergencies he was under the care of the nurses and the interne who were employees of the hospital. Within the scope of their employment their employer is legally responsible for their negligence to a patient. *Wetzel v. Omaha Maternity & General Hospital Ass'n, ante,* p. 636. The patient's physician did not manage nor control the hospital, and he is not liable for the negligence of hospital nurses and internes, if he had no connection with any negligent act. *Harris v. Fall,* 177 Fed. 79, 27 L. R. A. n. s. 1174, and note. In absence of the physician employed by Broz, and in absence of the latter's wife, and of his relatives and friends, while he was under the exclusive care of hospital nurses, he took bichloride of mercury and died as a result. These facts are indisputably established. Several hours after the poison had been taken, the hospital authorities in the meantime having had ample time to make an investigation, Dr. Mares called upon the head nurse, and, according to his testimony, was told that the patient had taken poison. "How did he get it?" was then asked. This was a proper inquiry by the patient's brother-in-law. It was directed to the head nurse, an employee of defendant. She was the person who would be most likely to know the truth. The inquirer had a right to know the fact. The nurse, instead of fully answering the question, directed the inquirer to go to the patient's room and ask how and where he got the poison and what it was. Dr. Mares did as she directed, returned, and told her what the patient said. She replied: "That is what I thought." This is the story of Dr. Mares. Were the statements of the patient, in connection with what the head nurse said, admissions binding on defendant? The expression, "That is what I thought," may fairly be construed to imply previous knowledge on part of the head nurse and to indicate the approval of the patient's version of what he took and where he obtained it. An eminent text-writer says: "The admissions of a third person are also receivable in evidence, against the party who has expressly referred

another to him for information, in regard to an uncertain or disputed matter. In such cases, the party is bound by the declarations of the persons referred to, in the same manner, and to the same extent, as if they were made by himself." 1 Greenleaf, Evidence (16th ed.) sec. 182.

Even if no reply had been made by the head nurse to the statements tending to show negligence on the part of defendant's employees, silence might be considered an admission, under the circumstances, since the head nurse would naturally deny statements implying negligence, if untrue. 16 Cyc. 956. Defendant is a corporation and could only act through officers, agents or servants, and it is bound by what they do in the performance of their duties. Where a hospital patient takes poison at night in the absence of his physician and friends, while he is under the exclusive care of nurses and internes, harsh and technical rules of evidence should not be enforced to exclude proper testimony tending to throw some light on material facts which, on account of the pecuniary interests and the reputation of the hospital, there might be a temptation to conceal. The conclusion is that there was no error in overruling objections to the admissions or declarations proved.

It is further contended that there was no evidence of negligence on the part of defendant in treating the patient after he had taken the poison, and that the trial court erroneously submitted the question to the jury. At night, during the absence of the patient's physician, it was clearly the duty of the hospital interne, who was a physician, and the nurses in charge, to give such treatment and attention as the emergency demanded, when known. Defendant was prepared for such an exigency. One of the purposes of a hospital in assuming control of a patient, for private gain, is to furnish promptly modern equipment, facilities and treatment. To avail himself of these advantages the patient left his farm in Saline county and entrusted himself to the care of defendant. The duties which such a hospital owes to a patient are commensurate with the responsibilities assumed. The approved rule is that a pa-

tient is generally admitted to a hospital, conducted for private gain, under an implied obligation that he shall receive such reasonable care and attention for his safety as his mental and physical condition, if known, may require. *Wetzel v. Omaha Maternity & General Hospital Ass'n, ante,* p. 636. Within the meaning of this rule, the interpretation which the trial court put upon the proof of negligence on the part of defendant in treating Broz, after he had taken bichloride of mercury, is approved upon an examination of all of the circumstances of the case, and error in submitting the question to the jury is not affirmatively shown. It may fairly be inferred from all of the proofs relating to this subject that nurses were promptly apprised of the taking of the poison and that proper treatment was negligently delayed.

Another reason urged as a ground for reversal is the absence of evidence that Broz would have recovered, with an earning capacity justifying the verdict. A mere fitful or temporary mental disorder will not be presumed to continue. *Turner v. Rusk,* 53 Md. 65; *People v. Francis,* 38 Cal. 183; *Hall v. Unger,* 2 Abb. (U. S.) 507; *Leache v. State,* 22 Tex. App. 279; *Ford v. State,* 71 Ala. 385. In the present case there is proof tending to show that the mental disorder was temporary and that the patient would have recovered, had he not taken poison. An earning capacity sufficient to support the judgment is also shown. On these issues the credibility of the witnesses and the weight of the evidence were questions for the jury, and in the respects mentioned no sufficient reason for setting aside the verdict has been suggested.

A direction to the jury submitting the question of negligence on the part of defendant in leaving Broz unattended in his room and in the halls is criticized as erroneous. In this connection it is insisted that the physician employed by Broz instructed defendant to allow him the freedom of his room and the halls, that employees of defendant did so, and that it is not chargeable with negligence for complying with instructions. The directions of the physician should be considered with the duty of the

hospital to give the patient such reasonable care and at-tention for his safety as his mental and physical condition required. Defendant was not instructed to allow the patient, who had been suffering from a fitful mental disorder, access to a hospital sinkroom, where poison, in the form of medicine tablets, were kept. Whether there was negligence in allowing the patient access to such a place in the night, while unattended, was a question for the jury.

The views taken in regard to the proofs and to the law applicable thereto result in the conclusion that there was no prejudicial error in giving or in refusing instructions to the jury.

AFFIRMED.

SEDGWICK, J., dissenting.

The facts of this case are in some respects identical with those in *Wetzel v. Omaha Maternity & General Hospital Ass'n, ante,* p. 636. This defendant was also defendant in that case, and it appears that it was organized to own and conduct a hospital for profit, and that the hospital is not an eleemosynary or charitable institution and is liable for negligence in the performance of duties undertaken by it.

The court submitted the case to the jury with the following instruction: "The plaintiff bases her right to recover in this action upon two specifications of negligence on the part of the defendant: (1) That the defendant was negligent in permitting Adolph F. Broz to remain for a long time unattended and unguarded in his room, and in the hallways of the hospital, and in negligently leaving in an exposed and unguarded place the poison which Adolph F. Broz took. (2) That after the employees and agents of the defendant were apprised that Adolph F. Broz had taken poison, it negligently failed to administer proper remedies and antidotes for the relief of said Adolph F. Broz." The issues so stated were substantially the issues tried by the parties.

The theory of the defendant is that the deceased left his room and went to the sinkroom, and there found the bichloride of mercury which he took with suicidal intent, and that in such case the defendant would not be liable. The theory of the plaintiff is that he found these tablets on the table near his bed in his room, and that he took them by mistake, supposing they were medicine prescribed for him. By the above quoted instruction the court submitted both of these theories to the jury. It appears to be conceded that, if the deceased was in his right mind so as to be responsible for his acts and took this poison with the purpose and intention of destroying his own life, there would be no liability on the part of the defendant. One of the contentions of the defendant is that there was not sufficient evidence to justify submitting to the jury the question whether these bichloride tablets were found upon the table in the patient's room. The evidence of Miss Thimling, his nurse, was clear and positive that when she left his room a few minutes before he took the poison there were no tablets or medicine of any kind on the table, and that she never saw any of the tablets in his room, and these tablets were never taken to the sick rooms. Her testimony was supported by the positive testimony of many witnesses and must prevail, unless there is substantial evidence to the contrary. Some of the defendant's evidence upon this point will be further stated in another connection. The only evidence tending to prove that they were found there by the patient is the evidence of the plaintiff and her brother, Dr. Mares, that the patient made declarations to that effect. This evidence was objected to as incompetent and hearsay.

There was substantial evidence that the deceased had gone to this sinkroom and had taken this bichloride of mercury for the purpose of taking his own life. The next morning, about nine hours afterwards, Dr. Mares visited the patient in his room, and upon the witness-stand he was asked: "Now, doctor, you may state what Adolph Broz said to you in that room that morning?" This was objected to on the ground that it was incompetent and

hearsay. The objection was overruled, and the defend-
ant answered: "When I came in the room I said, 'Adolph,
what did you do, and what did you do it for?' and he
said, 'I did not do anything.' He said, 'I took four tablets
off the tray on the table.' He pointed at the table, and
he said he thought it was his medicine, and I asked him
what kind they were, and he said they were blue in color,
and a little smaller than usual. And then he told me that
he took them because lately they were changing medicine
on him, and so he thought it was his medcine, and I asked
him if he used to take so many, and he said, no, he only
took two, and sometimes only one, and those were grayish
in color and a little bit larger. And then he also told
me that he drank a glass full of something that tasted
oily. I asked him, 'Did it make you sick,' and he said,
'No, not right away,' but in a few minutes he started to get
cramps and pains in his stomach and started to vomit."
The defendant then moved to strike out this evidence be-
cause it was incompetent and hearsay, and the motion was
overruled. This evidence was, of course, incompetent as
a dying statement, since evidence of dying statements is
allowed only in criminal cases. It is contended that it is
competent as a part of the *res gestæ*. The modern rule
as to what is and what is not a part of the *res gestæ* is
aptly and carefully stated in *Insurance Co. v. Mosley,* 8
Wall. (U. S.) 397. This case is of the more importance
and interest because it considered and determined no other
question and because two of the justices dissented, and
the question is quite elaborately and thoroughly discussed
in the dissenting opinion. The law is stated in the syl-
labus: "The *res gestæ* are the statements of the cause
made by the person injured almost contemporaneously
with the occurrence of the injury, and those relating to
the consequences made while the latter subsisted and were
in progress." That is, in an injury of this kind there are
two things to be considered, the cause and the conse-
quences of the injury. If it is desired to prove the cause
of the injury, statements "made by the person injured al-
most contemporaneously with the occurrence" are *res ges-*

*tæ*, the things done that constitute the cause of the injury. If it is desired to prove the consequences of the injury, then statements made by the injured person while the consequences subsist and are in progress may be evidence of the *res gestæ*, the things suffered as the consequences of the injury. And so, in this case, if it was desired to prove the condition in which the physician found the patient, it would be competent to prove the questions of the physician and the answers of the patient as to his suffering and such matters as would enable the physician to determine his condition. In the case cited Mrs. Mosley testified that her husband left the bed "between 12 and 1 o'clock; that, when he came back, he said he had fallen down the back stairs, and almost killed himself; that he had hit the back part of his head in falling down-stairs; * * * she noticed that his voice trembled; he complained of his head, and appeared to be faint and in great pain." His son testified: "That, about 12 o'clock of the night before-mentioned, he saw his father lying with his head on the counter, and asked him what was the matter; he replied that he had fallen down the back stairs and hurt himself very badly." From this it appeared that in a very short time after the deceased left his bed he was found injured and made these declarations as to its cause, which brings them within the rule announced in the syllabus, as statements of the cause made by the person injured almost contemporaneously with its occurrence.

It will be observed that the declarations testified to by the witness in the case at bar related wholly to the cause of his injury, the taking of the poison, and not to the consequences of the injury. They were made, not almost contemporaneously with the cause to which they related, but some nine hours thereafter. He was asked by his brother-in-law: "What did you do, and what did you do it for?" He had had ample time to consider his action, and had suffered very much from its consequences. He knew that his brother-in-law would disapprove of his taking poison purposely. His answer tended to shield himself from blame, and was in no sense contemporaneous with the act

that it is supposed to explain. This same witness was allowed to testify to a conversation that he had with the deceased at about 10 o'clock on the following night, nearly 24 hours after the cause of the injury, which declarations related wholly to the cause of his injury and had nothing to do with the consequences of the injury; that is, the condition in which the physician found him.

The plaintiff first saw her husband after the accident about 4 o'clock the following afternoon. She testified that when she went into the room the nurse was treating Broz, and that she asked the nurse what her husband took, and the nurse said, "He took some poison pills," and that while she was in the room the nurse was there. "He (Broz) was pointing to the table, and he said: 'I took them on that table, on the little tray, I thought they were my medicine;' " that the nurse told her to ask him and she asked him, and that his statement was an answer to her question, and that after her husband had made that statement the nurse did not say a thing. It seems clear that this evidence was not admissible as part of the *res gestæ*.

It is said that this evidence was competent as admissions of the nurses which would be binding upon the defendant. The physician testified that he was requested by the head nurse of the hospital to ask these questions of the patient, and that he reported to the nurse what the patient had said, and that the nurse replied: "That is what I thought." If we consider that the doctor's evidence in regard to these declarations was competent as proving admissions on the part of the hospital authorities, the supposed admission of the nurse was so indefinite as to be of little value. Her expression, "That is what I thought," might have related to the fact of his having taken poison, or it might have related to the manner of his taking it, as shown by the alleged declaration. Such evidence is not of sufficient importance to overcome the evidence on this point which is further stated in the discussion of the following contention. The contention that these tablets were found on the table in the patient's room should not have been submitted to the jury.

The defendant contends that there is no evidence of negligence on its part in the treatment of Broz after the discovery of his condition.    The evidence shows that, if the patient had swallowed a large quantity of bichloride of mercury, a delay of a half hour, and probably a much shorter time, in administering antidotes would generally, if not always, prove fatal.    The interne and nurses were not physicians.    This was understood by all parties.    The physicians were employed by the parties and their friends. Negligence therefore, could not be imputed to the defendant because of not keeping a competent physician in continual attendance.    It was the duty of the defendant to furnish attendants of ordinary prudence and caution.

Miss MacRea testified that she and Miss Thimling were in the hall not far from the patient's room, and when she heard the moaning and vomiting in the patient's room she went there immediately and found him upon the floor, etc., and called his nurse, Miss Thimling, who came at once.    They together returned the patient to his bed, and Miss MacRea questioned him as to the cause of his condition, and he told her that he had taken tablets from the sinkroom.    She ran to the sinkroom and obtained some of the bichloride tablets and showed them to the patient, and asked him if that was what he took, and he answered that it was; that he knew he never would get well, and that he didn't want to live any longer, and that was the reason he took the tablets.    She then ran immediately to the head nurse and to Dr. Parsons, the interne.    She says this was done instantly and didn't take her more than a minute, and they told her to give him some milk and the whites of eggs, and she and Miss Thimling gave him the milk and whites of eggs before Dr. Parsons arrived, which was almost immediately, and that then, under Dr. Parsons' directions and with his help, they gave him a large quantity of milk and at least three whites of eggs.    The witness called Dr. Coulter and informed him of the condition and what they had done.    He gave them some additional directions which they proceeded to comply with.

Miss Thimling, who was in charge of the patient at the time, testified that she was in the hall and heard groaning and vomiting in the patient's room. Miss MacRea was with her and went at once to the patient's room, and she followed almost immediately. She gave him his medicine at about 9 o'clock that night and was frequently in his room afterwards and before the accident occurred. He came out into the hall several times and she took him back. He complained that his room was hot and that he couldn't sleep. She testified that Miss MacRea went to his room first and she followed immediately after, and that when she reached the room he was telling Miss MacRea what was the matter with him, and said that he had taken blue pills, and she asked him where he got them, and he told her, "Out of the little room, out of a bottle," and she asked him what he took them for, and that was the last she heard. She was called out of the room to attend to another patient and returned immediately. When she went back to the room Miss MacRea had gone to call the head nurse and the doctor, and when Miss MacRea returned they gave him a glass of milk and the white of an egg. After they had given him that he refused to swallow, and Dr. Parsons, the interne, had come by that time, and they gave him two quarts of milk and the whites of two eggs through the stomach tube; that Dr. Parsons talked with him, and he "told the same thing that he told Miss MacRea." She never heard him say anything else as to where he got the tablets. She testified that the bichloride tablets were kept in the sinkroom, and that she had never seen any in any place in the hospital except in the sinkroom, operating room, and the drug room; that when she had given him his medicine she washed the glass and placed it on the table beside his bed, and that there was no medicine on the table, and that she never saw any medicine in his room during the time that she waited on him, except when she administered it to him.

Dr. Parsons also testified that when he was called by Miss RacRea he went at once to the patient's room, and he corroborates her fully in regard to the treatment and in

regard to Broz's statements as to the cause of the accident.

If these witnesses are to be believed, Mr. Broz procured these tablets from the sinkroom. It was not discovered that he had taken poison until it had already taken effect and he was suffering severely therefrom. Then the nurses placed him upon the bed and got their instructions from the head nurse and Dr. Parsons and administered the proper antidotes without any delay. The proper treatment must have been administered within a very few minutes, not more than three or four, probably within two minutes after he was found. This evidence is without contradiction. The allegation of negligence in the care of the patient after the poison was taken is not supported by the evidence and should not have been submitted to the jury.

The evidence of the plaintiff and the witness Mares as to declarations of the deceased were incompetent, and the allegations of negligence in leaving the poison tablets in the patient's room and in neglecting proper remedies after it was discovered that he had taken poison were not sustained, and those issues should not have been submitted to the jury.

LETTON and HAMER, JJ., concur in this dissent.