## THE CENTRAL RAILROAD *vs.* CROSBY.

1. Where, in a suit by a wife for the homicide of her husband, who was a railroad employé, the Carlisle tables of mortality were introduced in evidence and the value of the services of the deceased proved, thereby furnishing a measure of damages, and after a verdict for the plaintiff for $12,000, and pending the motion for new trial, counsel for plaintiff voluntarily wrote off from the verdict $2,000, so as to come within the measure of damages proved, the refusal of a new trial was not error.

(a.) This case differs from that of the *Savannah, Florida and Western Railroad vs. Harper,* 70 *Ga.,* 619.

(b.) Counsel for the plaintiff could write off any part of the damages recovered, and the defendant could not complain, because it was not hurt by making the judgment less.

JACKSON, C. J., dissenting.

2. In a suit against a railroad on account of the homicide of an em-

v 74-47

ployé, an allegation that the company did the negligent or careless act which caused the homicide, or omitted the diligence which would have prevented it, is sufficient, and is equivalent to an allegation that the co-employés of the decedent were guilty of such negligence.

3. In a suit by the widow of a deceased employé of a railroad for his homicide by the negligence of his co-employés, a plea which admitted the killing but did not admit either that decedent was free from fault or that the other employés were at fault, was not a plea of justification.

(*a.*) Where all the evidence, admissible under a plea claimed to be a plea of justification, would be admissible under a plea of the general issue, such a plea would not amount to a plea of justification, or give the defendant the right to open and conclude.

4. The Carlisle tables of mortality are admissible in evidence. They are not conclusive, but may be considered by the jury as *data* on which they may act.

5. When read in connection with the entire charge, there was no error in charging, on the issue as to the engineer's remaining on his engine, or jumping off to save his life, when a collision was imminent, that if, in the emergency upon him, he believed, and had reason to believe, that by sanding the track or otherwise working the engine, he could prevent a collision and save life, and it was necessary to that end that he remain at his post in this moment of danger, then for his death, resulting from such collision, his widow could recover; but if it was not so necessary, and he knew it, or ought to have known it, then she could not recover on this issue.

6. The refusal to charge the requests contained in the fifth, sixth and seventh grounds of the motion for a new trial will not authorize a new trial, when considered with the charge of the court. The charge was full, fair, clear and able.

7. The evidence as to the negligence of the deceased was close, but was sufficient to uphold the verdict.

JACKSON, C. J., *dubitante.*

8. In respect to avoiding an injury from the collision o a freight with a passenger train, by leaping from his engine, the engineer on the freight train should remain at his post so long as his presence on the engine may be of use to prevent the catastrophe.

March 17, 1885.

Verdict. Attorney and Client. Practice in Superior Court. Railroads. Damages. Negligence. Master and Servant. Evidence. Before Judge SIMMONS. Bibb Superior Court. April Term, 1884.

Mrs. C. E. Crosby brought her action for damages against the Central Railroad, to recover on account of the death of her husband, caused by a collision of trains on that road. She laid damages at $50,000.00. The defendant pleaded the general issue, and also filed special pleas, admitting that Crosby was killed by the collision of its train, but alleging that he was the engineer on one of them, giving a detailed history of the running of the trains from Savannah to the point of collision, and alleging that the train, which was running in front of that on which Crosby was, became divided by the breaking of a pin; that he was in violation of his duties in running at an improperly high rate of speed, and in not having his train under proper control; that he did not use proper means of stopping it; and that it ran into the one in front of it through his own carelessness; also that he remained on the train when it was apparent that a collision was unavoidable, and thus voluntarily exposed himself to the danger resulting therefrom.

On the trial, the following facts, in brief, appeared: Three trains left Savannah for Macon on November 27, 1880. These were respectively known as follows: Number 7, a freight train, was composed of two sections, A and B, both of which left Savannah at four o'clock P. M. and were due in Macon at five o'clock A. M. on the following day. Number 9 also was composed of two sections, A and B, carrying freight. They left Savannah at 5:40 P. M., and were due in Macon at eight o'clock A. M. the next day. Number 3 was composed in part of freight cars and in part of passenger and sleeping cars. It left Savannah at 7:30 P. M., and was due in Macon at eight o'clock A. M. the next day. Crosby was the engineer of section A of number 9. At station number 12, Crosby's train caught up with number 7, and learned that section A of the latter, by reason of a disabled engine, or some other reason, could not make schedule time. The engineer on section B of number 7 testified that section A of that train was

run by an old gentleman who could not "pull his train;" that the witness ran close behind him so as to aid him, as was the custom with engineers where a train was "weak." Crosby followed both sections of number 7 until he reached station number 16, which he did as number 7 was leaving. By this time, however, the trains had fallen behind, so as to be on the schedule of number 3, and therefore sections A and B of number 9 took the side-track and waited until number 3 should go by, which it did, and Crosby's train then followed, and was in turn followed by section B. Train number 3 reached station number 17 as train number 7 was leaving, and followed shortly afterwards, on its own schedule. Sections A and B of number 9 followed some ten or twelve minutes afterwards, on the schedule of number 3, being flagged by the latter. After leaving station number 17, there is a long up-grade, and after reaching its top, there is a long down-grade in which there are curves and cuts. In climbing this grade, train number 3 came up with section B of number 7, and as number 3 began to go down the grade, the engineer shut off steam and allowed the train to roll down. When the time came for him to increase his speed, he opened the throttle, and when he did so, he felt a jerk behind, and looking back, found that the rear portion of the train, where the passenger cars were, had become detached from the front portion. The separation of the hose or pipes connecting the engine with the passenger cars caused the air-brakes to be applied, and the latter stopped, while the front portion of the train moved forward. On making the discovery, the engineer stopped his engine within about six car-lengths, as he testified, or a little more, as others testified, told his wood-passer to gather up the hose which had pulled loose and was on the track, and started back to re-couple the separated portions of the train. A train-hand also was assisting in gathering up the hose. He discovered that the coupling-pin was broken, and called to another hand to bring another pin, but the person called appeared not to

have heeded the call, being occupied in warning the passengers of the approaching danger. When the engine nearly reached the detached cars, the engineer testified that he heard the whistle of Crosby's train blow, and discovering that there was no chance to make the coupling before the latter reached the spot, he at once moved forward to get out of the way. He thought that, if they had had what was needed to make the coupling, it might have been done in time. When the rear portion of number 3 was found to be stopping, and it was discovered that it had become severed from the front portion of the train, the conductor told the baggage-master to go forward and make the coupling as quickly as possible, while he himself went back. When he had gone back about two hundred yards, he saw Crosby's train coming, and signalled for it to stop. The signal could have been seen about five or six hundred yards away. The conductor, who gave the signal, testified that, when signalled, Crosby's engine was 1,600 feet from the detached part of number 3. Crosby's train went on with very little, if any, diminution of speed, and ran into the rear end of the passenger coaches of number 3, and directly afterwards section B ran into the rear portion of section A. The fireman on Crosby's engine leaped from it, when he saw the approaching danger, and escaped injury. When Crosby reached a point where he could see the signal to stop, the evidence for the plaintiff shows that he blew on the brakes, reversed or tried to reverse his engine, applied steam, and began working the sand lever so as to sand the track. The evidence for the defendant tended to show that the engine was not reversed when found after the collision. There was some evidence to show that at times the lever would be jerked from the reversed position into a forward position. As to the necessity or propriety of Crosby's conduct, there was some conflict in the evidence. The plaintiff introduced evidence to show that working the sand-lever, and thereby sanding the track, in conjunction with reversing the engine and apply-

ing steam, would tend to stop the train sooner than it other-
wise would stop; that sometimes the sand would be clogged,
unless the lever was worked; also that the track was slippery
that morning.    The defendant introduces testimony to the
effect that, if Crosby had blown on brakes, reversed his
engine and opened the sand valve, he had done all that
could be done, and might have left the engine.    The fire-
man testified that Crosby said " look out;" that he jumped
from the engine, and that, before he jumped, he inquired of
Crosby if the latter was not also going to do so.    There
was testimony to the effect that a heavy freight train, in
running on an up-grade, could only run slowly, and would
necessarily run rapidly down grade, in order to make an
average of time, in accordance with the schedule.    It ap-
peared that Crosby put on all the steam he could in com-
ing up the grade, and had it on when the train turned on
the down-grade.    The speed of his train in coming up the
grade was estimated to be about eight miles an hour, and
in coming down about eighteen or twenty miles, and there
was some testimony to show that the train could not have
been stopped within the distance from where he was at the
time he was signalled to the broken section of number 3.
The conductor on Crosby's train requested the conductor
of number 3 to hurry away from station number 17 as quick-
ly as he could.    The latter flagged him, and he testified that
that put everybody on notice that Crosby's train was fol-
lowing on the schedule of number 3 and had the same
rights as had that train.    Both trains were some minutes
behind time when the collision occurred.    Some testimony
was introduced by the defendant to show that there was a
rule that trains running on the same schedule should run
a mile apart, but there was also testimony to the effect
that this was not observed, and the trains in advance of
Crosby were not keeping that distance.    The defendant
also introduced some evidence to show that an engineer
would not be considered an ordinary risk for life insurance,
but that a higher rate of premium would be charged on

his life than on that of a person engaged in an ordinary occupation.

The plaintiff testified that her husband was not quite thirty-seven years of age, and was receiving $105 per month, out which he supported himself and family. The Carlisle table of life expectancy was introduced.

The jury found for the plaintiff $12,000.00. The defendant moved for a new trial, on the following among other grounds:

(1.) Because the court erred in refusing to allow the defendant to open the case or to open and conclude the argument.

(2.) Because the court erred in allowing the Carlisle table to be read and used before the jury, on the trial, as evidence,—the defendant insisting, by way of objection, that these calculations were made up upon the basis of the average of the lives of a great number of persons in the ordinary and usual avocations of life, while Crosby, the deceased, for the loss of whose life this suit was brought, was engaged in working as an engineer and lost his life in that business—a most hazardous occupation.

(3.) Because the court, after charging the jury to "look to all the evidence that led up to the accident, then look to see whether he," (Crosby), " could have avoided it by the exercise of ordinary care; look to how the train was running; look to what he had done, and whether it was necessary for him to continue to do anything on that train. If you find that it was not necessary, find that the simple sanding of the track would not have prevented the collision, and he knew of it, or ought to have known it,"— erred in adding: "You can say whether he ought to have jumped off or not." The court also erred in further adding: " Or if you find that it was necessary for him to stay there to sand the track for the protection of his life, or the lives of the passengers and property, then you would find against that position and find in favor of Mrs. Crosby."

(4.) Because the court erred in failing to give the following charge to the jury, as requested in writing by defendant's counsel: "If you believe from the evidence that the plaintiff's husband could, by the exercise of ordinary care, have avoided the danger of a collision of the engine controlled by him with the cars on the track ahead of him, and he did not, then the plaintiff is not entitled to recover. To illustrate: if, after he saw, as an engineer, on approaching the obstruction on the track, that a collision was inevitable, that might result in his death, and he could, after that, have avoided that danger by quitting his engine, then he was bound to do so; if he did not, then the plaintiff is not entitled to recover. To determine this question, you are authorized (to look) to the evidence of experts, such as other engineers, as to what is customary and proper to do in such exigencies."

(5.) Because the court failed to give the following request made by defendant's counsel: " If you believe from the evidence that, though the defendant may have been negligent in having the train standing on the road, or in failing to give notice promptly to the approaching train; yet, if you believe that Crosby could have saved himself from the effects of this negligence by the use of ordinary care on his part, or by any act which a careful engineer would have resorted to, then the plaintiff cannot recover. In considering the question of Crosby's exercise or want of ordinary care in saving himself from the consequences of the acts of defendant's agents, you should have reference to the opinions of experts of experience, of what he ought or ought not to have done at the moment, before the collision, to save his life."

(6.) Because the court erred in refusing to give to the jury the following written request of defendant: " If you believe that, in the exercise of ordinary care and with safety to himself, he, Crosby, could have avoided his death by quitting his train, then you may consider that as a circumstance to show a want of ordinary care and diligence."

(7.) Because the court erred in refusing to give to the jury the following written request of defendant to charge : "That the acts of negligence complained of and set out in the declaration are the only acts that can be considered by the jury to charge the defendant, and if you are not satisfied that the plaintiff's husband was killed by the collision of his train with the cars on the track, but are in doubt whether he was killed by the second collision produced by the rear freight train, then you cannot find for the plaintiff. in this case. She can recover alone on the negligent acts put out in the declaration."

(8.) Because the verdict of the jury is contrary to law and evidence and was excessive.

Pending the argument of the motion, counsel for the plaintiff voluntarily wrote off $2,000.00 from the verdict. The court overruled the motion, and defendant excepted.

A. R. LAWTON ; LYON & GRESHAM, for plaintiff in error.

BACON & RUTHERFORD, for defendant.

JACKSON, Chief Justice.

The defendant in error sued the plaintiff in error for the homicide of her husband, who was an engineer on its road, running one of its trains, when the incident occurred. It seems that, in consequence of a feeble engine on one of the freight trains running on the same schedule that the train of which Crosby, the defendant in error's husband was the engineer, wàs also running, all the freight trains got out of their regular order, and got on the same schedule on which a passenger train was running ; that an accident happened to this passenger train, causing it to lose or break a coupling-pin, and thus delaying it between Gordon and Griswoldville, and that Crosby's train ran into it while thus delayed, and he was killed.

The jury returned a verdict for twelve thousand dollars ; a motion was made for a new trial ; the counsel of plain-

The Central Railroad vs. Crosby.

tiff in error wrote off two thousand dollars, on their own hook; the court refused to grant a new trial, based on this ground and many others, and that refusal on all the grounds is assigned for error here.

1. My own opinion is very decided that no party or counsel has the right, without leave of the court, to alter, in any particular whatever, the verdict returned by a jury pending a motion for a new trial, or when such motion is in contemplation; and that when the refusal of the court to grant a new trial is based in a large degree on that alteration, a new trial should be granted by this court, and the judgment should be reversed on that ground, especially where the case on the facts is very close and the verdict quite large.   The other members of the court differ from me on the point, however, holding that such a right exists in a case like this, where a fixed criterion is given for estimating damages, in their judgment, and where, by the reduction of the verdict, the plaintiff in error is not hurt, as they think the evidence shows, and where the judge ratifies what the counsel did by refusing a new trial on that ground.

My own opinion is that, where the presiding judge shows, in the reasons which he gives for refusing a new trial, that he was influenced by this act of counsel, the plaintiff in error was hurt.   The probabilities are that the new trial would have been granted by the presiding judge, if the reduction had not been made by the counsel; for he hesitated and doubted much about the case, and that hesitation settled into a determination to refuse the new trial, when he considered this unauthorized reduction, as his opinion in the record clearly shows to my own mind. Therefore I think that the plaintiff in error thereby lost its case; for if a new trial had been granted below, it would have been affirmed here.   Moreover, I think that even the court below has no power to order the reduction of damages in a case like this, or to make the grant of a new trial depend upon such reduction being made; be-

cause damages are for the jury to assess, and there are no settled and fixed rules for estimating damages in a tort like this.

The uncertainty of life—the mere expectancy of its duration—the approach of age—the decline of strength—the hazard of so hard a life, so much exposed and worn—the uncertainty of employment—all these and many more considerations move a jury in estimating damages according to law, and no human being can tell what aliquot part is not supported by evidence and ought to be written off.

My brethren, however, differ from me in their views, and when I write the opinion, affirming this judgment, I am but their organ. They hold that this case, on the matter of a fixed criterion for damages is unlike *Savannah, Florida and Western Railway vs. Harper*, 70 *Ga.*, 119; that in that case there was no fixed criterion for estimating damages; whereas, in this case there is, inasmuch as the Carlisle table of the expectancy of life fixes a recognized criterion for measuring damages when used in connection with the annual proceeds of the husband's labor; and therefore they hold that this case is not controlled by that; and that, as damages could be measured by this criterion, and as, in their judgment, the counsel had the right to write off any part of the damage and plaintiff in error could not complain, because not hurt by making the verdict against it less, they hold the plaintiff in error not entitled to a new trial on this ground.

2. We all agree that the defendant in error need not allege in the declaration that the homicide was caused by the acts of co-employés. When caused by employés of the company, it is caused by the company. The company, as a corporation, can cause nothing except through and by agents, who are all employés, and the allegation that the company, a corporation, did the negligent or careless act which caused, or omitted the diligence which would have prevented, the homicide, is an allegation that its em-

ployés were negligent and careless, and lacking in diligence.

3. So the court is unanimous in the opinion that the presiding judge did not err in overruling the plea of justification, so as to deny the plaintiff in error the right to open and conclude. The plea is not a plea of justification. It only admits the killing; it admits nothing on which the defendant in error could recover without more; it does not admit, either that her husband was not at fault, or that the company was, so as to take any burden off the shoulders of the defendant in error, who, being an employé's wife, must show either the one or the other, before any recovery can be had, or any presumption be made against the company.

Besides, if it did, it would not be a good plea of justification, because the general issue of not guilty would admit all the evidence which plaintiff in error could introduce under the alleged plea of justification. *Chapman vs. A. and W. Pt. R. R.*, this term.*

4. It is not an open question that the Carlisle tables are evidence in the courts of this state. The conclusiveness of the evidence or the degree of its weight are different matters. That they are not conclusive, nobody questions; but they furnish *data* on which the jury may act, and make a circumstance to be weighed by them.

5. The charge excepted to in the fourth ground of the motion, read in connection with the entire charge in the record, is not error. In summing up on the issue of the engineer remaining on the engine or jumping off to save his life, the judge, in our opinion, put the issue fairly before the jury in charging to the effect that if, in the emergency upon him, he believed, and had reason to believe, that in sanding the track, or otherwise working the engine, he could prevent the collision and save life, and it was necessary to that end that he remain at his post in this moment of danger, then the defendant in error could re-

*Ante, p. 547.

cover, but if it was not so necessary, and he knew it, or ought to have known it, then she could not recover on this issue.

6. The refusal to charge the several requests embodied in the fifth, sixth and seventh grounds of the motion, is not deemed sufficient to authorize a new trial, when considered in connection with the clear, concise and able charge of the fair-minded and upright judge who tried the case. A more complete and correct, a more luminous and more easily understood charge to a jury on the law applicable to the facts of the case, it would be hard to find in the books or hear from the circuit judge, and it strikes us as impartial, as it is in other respects excellent.

7. We all think the case close on the issues of negligence in the company and negligence in the deceased, but my brethren think that the evidence is sufficient to uphold the verdict on those issues. I incline to the opinion that the facts make one of those accidents incidental to the business in which the deceased was engaged, with no appreciable fault in the deceased, or in the other employés; and while the catastrophe is to be deplored, it is difficult to see that aught but accident incidental to the business of an employé of the company, caused his death; and therefore, his unfortunate widow has hardly made a case for recovery.

8. In respect to the issue of avoiding the catastrophe by leaping from the engine to save his life, we all agree that at such a moment, in charge of such a train, in view of passenger cars in his front, full of human life, to remain at his post in the hope of saving other lives would be an act of heroism so exalted as to constrain approval from all human hearts, and that courts, however cold and calm duty requires them to be in all cases, should place themselves in the position of the engineer at the moment of such imminent danger, demanding such instantaneous decision and action, and should not scan closely the grounds of hope he may have had to save others, though risking himself in the ef-

fort. It is the policy of the carriers, as well as that of the great public carried rapidly by their trains, not to encourage the officer in charge of the engine that moves those trains to abandon his post in the moment of danger, but to reward the courage of remaining, if there be a hope, however slight, of saving two trains from collision and wreck and the lives of hundreds aboard. Whilst, if there be no shadow of hope of averting disaster to others, the engineer should save himself; yet on a hope, however faint, for reasons, however inconclusively establishing the soundness of his conclusion that by risking his own life he would prob·ably save other lives, he should remain at his post; and the act of heroism, though inoperative of good either to himself or others in the particular case, should be regarded as martyrdom to public policy, rather than want of precaution to save himself. No man needs much encouragement to save his own life. " Self preservation is the first law of nature." It requires kinship to Christ to die, or to risk death, to preserve the lives of others.

The reasoning of the Supreme Court of Wisconsin, in Cottrell, adm'r, vs. The C. M. and St. P. Rwy. Co., 47 Wis. R., 634, strikes us with great force, and the great principle of public policy alluded to above cannot be better enforced and illustrated than by citations from the opinion of that court in that case.

The court there say: "The very employment of the locomotive engineer, with its manifold and sudden and unexpected dangers, requires the highest type and best qualities of true manhood, invincible bravery, and great integrity . . . They are placed in charge of one of the mighty forces of nature, held in servitude by the most dangerous and intricate machinery, and great skill, unremitting attention, sleepless vigilance and fearlessness of danger are required to keep them in constant control. . . . The question which should determine their reasonable care or want of care is, how careful and prudent locomotive engineers would ordinarily and commonly act

at such a time, in such a place and such circumstances, and not how firemen or other employés would or should· . . . It will not do to establish a rule by which the· ·duty of an engineer in such an emergency may be measured and dictated by cowardice and timidity, and by which his standing at his place and facing danger will be carelessness and negligence. Who shall sit in judgment upon this brave engineer, to coolly determine the alternative .risks and chances which he is compelled to take instantly,· with scarcely a moment for deliberation, in such a terrible emergency? The defence resting. upon such a theory in this case cannot be sanctioned, although cases may possibly arise in which even the common prudence of an engineer might require him to leave his engine to escape ·danger; but such cases will be rare exceptions, and depend upon very peculiar circumstances."

The facts of that case are quite similar to this. There; as here, the fireman jumped and saved his life. There, as here, there was imminent danger of a collision. There, as here, it did occur, and the engineer was killed, with hand ·on throttle, trying to check and ·control his powerful machine. There the decision is squarely that the defence· was untenable. And we hold, with that court, that it must be clear, from the facts, that the engineer could not, with .any degree of probability, be of service at his post, before ·courts should hold it want of common care for him to brave danger and stand at his post.

Judgment affirmed.