## Chesapeake & Ohio R. R. Co. v. Brown, Admx., et al.

(Decided February 26, 1913.)

### Appeal from Shelby Circuit Court.

1. Master and Servant—Fellow-Servants.—The master will not be excused from negligence resulting in injury to one servant which is inflicted by a fellow-servant, unless the servants are so engaged and situated as that each, by carefulness and attention in the performance of his duties, may protect himself from injury caused by the negligence of the person with whom he is working.

2. Fellow-Servants—Brakemen on Separate Trains Are Not.—Brakemen on different trains owned by the same employer are not fellow-servants, and either may recover from the master for injuries received through the negligence of the other.

3. Railroads—When Employee May Imperil His Life.—An employee on a railroad train may lawfully imperil his life to protect the lives of the persons on the train, provided he uses such care as may reasonably be expected of a person of ordinary prudence, similarly situated; and, if he loses his life while so acting, he is not guilty of such contributory negligence as will prevent his personal representative from recovering damages from the company for the employee's death.

WILLIS, TODD & BOND and SHELBY & SHELBY, for appellant.

CHARLES CARROLL, JOSEPH M. LEE, T. C. CARROLL and G. L. PICKETT, for appellee.

Opinion of the Court by Judge Miller—Affirming.

This is an appeal from a judgment for $11,000.00 damages, for the death of R. J. Brown, a brakeman in the service of appellant.

On the morning of December 24, 1911, appellant's passenger train No. 22 left Louisville for the East, about nine o'clock. Early on the same day appellant's passenger train No. 21 left Ashland, Ky., going west, and bound for Louisville. According to the schedule time, these trains should have met at Shelbyville, where the dining-car attached to the west-bound train (No. 21) was to be transferred to the east-bound train (No. 22); but, as No. 21 was late on this occasion, they met at Hatton, in the eastern edge of Shelby County and about 18 miles east of Shelbyville. Approaching Hatton from the west there is a decided descending grade in the road bed, the grade being downward toward the east. Train No. 21 having reached Hatton first, and having the right-of-way, remained upon the main track; train No. 22 going upon a side track upon its arrival shortly afterwards. Train No. 22 from Louisville was in charge of conductor Burch; Smith being the engineer; R. J. Brown, the deceased, being brakeman; and Charles Brown, the porter. The west bound (No. 21) was in charge of conductor Ridgeway, with Underwood as brakeman. The engineer of No. 21 set the air brakes for the purpose of holding his train on the incline. For the purpose evidently of saving time, and while waiting the arrival of No. 22, Underwood uncoupled the air hose between the sleeper and the "Diner," which constituted a part of train No. 21. This process "set" the air on the "Diner;" and, in railroad parlance, the brakes "stuck." Shortly thereafter No. 22 came in and took the side track; and when No. 21 tried to go out and up the hill, it could not move the dining-car, because its brakes were "stuck;" whereupon Underwood turned the cock on the drum of the "Diner" and let the air escape. Train No. 21 then pulled up the hill towards Louisville; and when it had gone about 600 or 700 feet, and cleared the point of the switch, it detached the dining-car, and proceeded on its way to Louisville, leaving the dining-car standing upon the grade. Train No. 22 immediately started to back up slowly so as to attach the "Diner" to it. There being no air in the brakes on the dining-car, it started to move down the grade toward train No. 22, which was backing up the grade. Brown was on the rear platform of the rear sleeper of train No. 22, standing by Conductor Burch, the porter being nearby. Seeing that the train and the "Diner" were moving toward

each other, and would probably collide if not stopped, Brown jumped from the sleeper and signalled engineer Smith to stop the train; and, at the same time, ran toward the "Diner" for the purpose of stopping it. But, shortly after he reached the "Diner," and while attempting to turn the angle cock which controlled the air brakes on the "Diner," he was caught between the "Diner" and the rear sleeper on the end of train No. 22, and instantly killed.

Appellant assigns four grounds for a reversal; (1) instruction No. 1 directed the jury to find for the plaintiff if they believed the injury occurred through the negligence of brakeman Underwood of train No. 21, who was, as appellant claims, a fellow-servant of Brown, who was brakeman of No. 22; (2) said instruction permitted the plaintiff to recover upon the hypothesis that those in charge of the dining-car were negligent after it was cut loose from train No. 21, those persons being likewise fellow-servants with Brown; (3) said instruction erroneously submitted to the jury the question of the defective hand-brakes on the dining-car, when there was no evidence that they were defective; and, (4) that a peremptory instruction should have been given for appellant, because Brown came to his death by his own gross contributory negligence.

There is quite a conflict in the testimony as to the relative positions of the "Diner" and train 22, up to a very few moments before the accident occurred. The testimony tends to show that train No. 21 ran about 600 or 700 feet west when it stopped and detached the Diner; and Sudduth, who was the conductor in charge of the dining-car says it rolled back eastwardly about 60 yards before it collided with train 22. In this he is corroborated by Perkins, who was sitting upon a porch near the track and watching the train at the time of the accident. Perkins having indicated the point where the "Diner" started and the point of collision, they were, by measurement, found to be 216 feet apart. It also appears from Perkins' testimony that after Brown gave the signal to engineer Smith to stop train No. 22, it moved westwardly 104 feet; that the distance between the rear end of train 22 and the "Diner," when Brown reached the "Diner," was between 20 and 28 feet, and that while Brown was working at the angle cock of the "Diner," it moved from 5 to 10 feet. The evidence fur-

ther shows that if the angle cock had worked, it would have stopped the "Diner" within three or four feet, at the rate it was then going. Furthermore, when it became apparent that a collision was imminent, one or more of the waiters on the "Diner" attempted to stop it by using the hand-brakes, which failed to work. Smith, the engineer, admits he got Brown's signal, and says he obeyed it and stopped the train; but in this, the weight of the testimony is decidedly against him. Perkins is not only a disinterested witness, but he had, by far, the best opportunity of seeing all that happened; and not only his testimony, but that of others, as well as the point where the collision occurred, all strongly contradict Smith. It further appears that immediately before the collision, the conductor, Burch, and perhaps the porter, called out to Brown to get out of the way, but he evidently did not hear it, at least not in time to heed the warning.

It is insisted for appellee that appellant's employes were negligent, (1) in cutting the dining-car loose from train No. 21 and permitting it to roll down the grade toward train 22; (2) in failing to have the dining-car equipped with proper hand-brakes and air-brakes; (3) in failing to stop train 22 after Brown had given the signal to stop; and, (4) as a question of law, it was the right and duty of Brown, under the circumstances, to attempt to stop the "Diner" in order to prevent a collision, provided in so doing he used such care as an ordinarily prudent person would have used under the circumstances.

Appellant's first and second grounds for a reversal rest upon the contention that Underwood, the brakeman on No. 21, as well as those in charge of the dining-car after it was cut loose from train No. 21, were fellow-servants with Brown. Waiving, for the present, the question of appellant's negligence in leaving the "Diner" standing detached upon a heavy grade, as it did, we will consider the fellow-servant doctrine in so far as it may be applicable to this case.

In the earlier cases of L. & N. R. R. Co., v. Robinson, 4 Bush, 507; L. & N. R. R. Co., v. Rains, 15 Ky., L. R., 423, 23 S. W., 505; and Robinson v. L. & N. R. R. Co., 15 Ky. L. R., 626, 24 S. W., 625, it was apparently held that an employe on one train could not recover from the company for the negligence of employees on another

train, belonging to the same company, unless the latter's negligence was gross; but, as was said in L. & N. R. R. Co., v. Brown, 127 Ky., 745, 13 L. R. A. (N. S.), 1135, those cases may now be regarded as having been overruled by the later cases therein referred to.

In that case, Brown was a brakeman on a freight train, and was injured in a head-on collision between his train and a work train, through the failure of the brakeman on the work train to flag the freight train in time to prevent the collision. The defense was that Brown and the brakeman on the work train, being brakemen upon separate trains belonging to a common employer, were fellow-servants, and that Brown could not recover for that reason. But, in laying down the modern rule upon that subject, the court said:

"When the servant is injured by employes of the same master, who are not directly associated with him, and with whom he is not immediately employed, and whose qualifications for the place they occupy he has no means of knowing, and in whose selection he has no voice; and over whose conduct and actions he has no control, and against whose negligence and carelessness he cannot protect himself, he may recover damages from the master for injuries received through their negligence, whether it be ordinary or gross, and without any reference to the position or place the servant causing the injury holds. And so appellee, whose injuries were directly caused by the negligence of the employees on the work train, may recover from the company, without regard to which one of them was guilty of the neglect that resulted in his injuries."

Again in the same case, on page 740, the court said:

"Neither the conductor nor engineer on the work train, or the brakeman who participated in their negligence and equally with them was guilty of a failure to discharge his duty, were fellow-servants of appellee in the sense that appellee could not recover for their negligence."

Again, in Louisville Ry. Co. v. Hibbitt, 139 Ky. 743, Hibbitt, a motorman on a street car, was injured in a collision between the car he was operating for the Louisville Railway Co. and a Market street car belonging to the same company, by reason of the negligence of the motorman of the Market street car. In that case the court said:

"The fellow-servant rule is invoked in many cases but applied in few. This court is fully committed to the doctrine of what is known as the 'association theory,' or, in other words, that the master will not be excused for negligence resulting in injury to one servant which is inflicted by a fellow-servant unless the servants are so engaged and situated as that each by carefulness and attention in the performance of his duties may protect himself from injury caused by the negligence of the person with whom he is working."

Then, after quoting, with approval, the language herein quoted from the Brown case, the court in the Hibbitt case further said:

"And this rule, to which we adhere, makes it plain that these motormen operating on different cars were not fellow servants. True it is they were fellow servants in the sense that they were employes of the street railway company; but in the performance of their duties they had no association with or control over each other. Each acting for himself had charge of the operation of the car upon which he was running. Neither could control the actions of the other, or protect himself from the negligence of the other. If the motorman on the Market street car negligently or carelessly ran his car into the car upon which Hibbitt was motorman, he should not be held responsible for his negligence or be denied a recovery against the master on account of it."

Milton's Admx. v. Frankfort & Versailles Traction Co., 139 Ky., 54, was precisely like the Hibbitt case in its controlling facts, and the court again quoted, with approval, the rule above taken from the Brown case, and re-affirmed in the Hibbitt case.

In view of these late decisions of this court directly in point, we deem it unnecessary to further extend the discussion, since it is apparent, under the rule there laid down, that Brown and Underwood, being brakemen upon different trains, were not fellow-servants; and the same is equally true of appellant's employes in charge of the "Diner" before it was attached to and became a part of train No. 22.

Appellant's third contention, that the first instruction erroneously submitted to the jury the question of the defective handbrakes of the "Diner" because there was no evidence at all that the handbrakes were defective, is not sustained by the proof. Sudduth, the con-

ductor on the "Diner," was called as a witness by the appellant, and expressly said that after the "Diner" had rolled about thirty feet, he tried the air brakes and had one of his men working on the hand brakes, and neither of the brakes would work. He further says that after their failure to get the brakes to work, he pulled the emergency rope, or "air rope" as he called it, which usually stops the car, but in this case without success. It is unnecessary to argue the proposition that either an air brake or a hand brake is defective when it refuses to perform the office for which it was placed upon the car. The mere fact that they failed to work when tried, was evidence that they were defective.

Finally, it is insisted that Brown cannot recover because his own contributory negligence caused his death. It is apparent from the proof that if engineer Smith had obeyed Brown's signal to stop the train, Brown would not have been killed as he was, since the "Diner" was moving comparatively slow, and moved only a few feet after Brown reached it. When Brown gave the signal for the train to stop, the sleeper was more than a hundred feet from the point of the subsequent collision, and when Brown reached the "Diner," the sleeper had covered less than one-third of that distance. Engineer Smith admits that he received Brown's signal, and Brown had the right to assume that his signal would be obeyed. Evidently, however, it was not obeyed, and Smith's negligence in this respect was the proximate cause of Brown's death. Under the circumstances he had the right to assume that the train would stop in obedience to his signal, and in attempting to stop the "Diner" under the circumstances, he was not guilty of contributory negligence. In C. & O. Ry. Co. v. Lang's Admr., 135 Ky., 76, it was held a person might lawfully imperil his life to protect the lives of the persons on a train, provided he uses such care as may be reasonably expected of a person of ordinary prudence, similarly situated. The same rule was announced in Becker v. L. & N. R. R. Co., 110 Ky., 474; Perpich v. Leetonia Mining Co., 118 Minn., 508; Central Railway Co. v. Crosby, 74 Ga., 737; Penn. R. R. Co. v. Roney, 89 Ind., 453; Cottrill v. Chicago, M. & St. P. Ry. Co., 47 Wis., 634; Gulf & C. R. R. Co. v. Brooks (Tex.) 132 S. W., 95.

Brown was not only performing his duty in the attempt to prevent the collision, but being clearly within

the rule just announced he was not guilty of such contributory negligence as would justify a peremptory instruction withdrawing that question from the jury.

Judgment affirmed.