516. CENTRAL OF GEORGIA RAILWAY COMPANY *v.*
MINOR.

1. Questions of negligence are peculiarly within the province of the jury; and this court will not disturb a finding of its existence, when such an inference is warranted by any phase of the evidence.
2. In an action for a homicide, in determining whether the verdict is, excessive or not, the question will not be decided by reference to the deceased's expectancy according to the mortality and annuity tables alone. A verdict will not be set aside as excessive when it is not so large as to justify the belief that it is the result of bias or gross mistake.
3. The judge may properly instruct the jury, in explanation of the use of the mortality and annuity tables, that "if, under the evidence, the expectancy would be greater or less than that of the average man, or the earning capacity would increase or decrease, the cash value of the life should be increased or decreased accordingly," when there is evidence that the person, the value of whose life is in question, was a young man of good health and habits, and was filling satisfactorily a responsible position.

Action for damages, from city court of Macon—Judge Hodges. April 20, 1907.

Argued October 21,—Decided November 11, 1907.

Minor, the husband of the plaintiff, was employed by the defendant company to work in its yards at Macon in the capacity of "hostler helper," a kind of understudy, as it were, to the man who sees that locomotives are properly prepared and furnished for use in actual service. His regular occupation was that of member of the city fire department; but he was doing this service with the view of learning the trade, to the end of being regularly employed in the motive department of the railway company. He had been working in this service only three days when he met his death. A locomotive had been brought to a chute to be coaled. He mounted the tender, to help in loading the coal. The method by which this work is done is, that the helper pulls down an apron—a kind of conveyer through which the coal runs from the chute to the tender—and then turns on the coal, which through the force of gravity runs from the chute, through the apron, into the tender. A cable attached to the upper portion of the apron, as it stands when not in use, is pulled, in order to lower the apron and admit the coal. Minor, after mounting the tender, pulled upon this cable, to lower the apron; and as he did so, and as the apron accordingly

came down and into touch with the metal part of the tender, he was instantly struck and killed by a current of electricity which escaped from a wire against which the cable came into contact. The wire was part of an arc-light circuit which supplied a lamp burning in front of the chute. The wires were attached to the chute and so located that the cable swung down between them. On investigation of the wires, it appeared that the insulation had been worn away at about the place where the cable would come into contact with it as it swung from the lowering of the apron of the coal chute. From the testimony of the expert electricians who testified in the case, the inference could be fairly deducible that the insulation had been worn away by the cable rubbing against the wire from time to time; though this was disputed by other testimony. The injury happened on a wet night; which tended to make injuries from the electricity more probable than when things were dry. It was shown that the wire had been installed by a reputable electric contractor; but there was no showing that the defendant had made any inspection. There was proof that the deceased, at the time of his death, "was twenty-six years old, perfectly healthy and had no bad habits," and that "he was a bright young man." He had been a member of the city fire department for five years, and in that employment received $60 per month. The city also furnished him light, lodging, and heat, free. A witness estimated this to be worth $12 to $15 per month; though, since the deceased was a married man and had to maintain a separate home, this probably resulted in no saving to him. The Carlisle mortality and annuity tables were in evidence. The jury returned a verdict of $10,715 for the plaintiff. The motion for a new trial, which was overruled, complains that the verdict is contrary to the evidence; also that it is excessive; especially so in light of the fact that it is in excess of the value of the life of the deceased," calculated even upon the highest earnings shown during his life," wherefore it is apparent that no deduction whatever was made for decreased earning capacity due to illness or old age; also because the court charged the jury as follows: "If, under the evidence, the expectancy would be greater or less than that of the average man, or the earning capacity would increase or decrease, the cash value of the life should be increased or decreased accordingly. The specific objection to this excerpt from the charge is

"that it allows the jury to consider the possibility of increased earning capacity of the plaintiff's husband; while the law does not authorize such recovery, for the reason that the same would be speculative, too uncertain, and too indefinite; also that there was no evidence before the jury that would authorize them to find that the plaintiff's husband's earning capacity would be increased, nor was there any evidence that could authorize the jury to find that his expectancy would probably be greater than that of the average man."

*Wimberly & Jordan,* for plaintiff in error.

*Joseph H. Hall, Warren Roberts,* contra.

POWELL, J.  (After stating the facts.)

1.  As to the contention that the verdict is contrary to the evidence, that no negligence on the part of the master is shown, that the death of the deceased came about by reason of an accident, unforeseeable by ordinary care, it is necessary to say only that the evidence was such that a verdict either way could have been legally justified.  Whether the wires were unsafely located in the beginning, whether the railroad company by ordinary care could have discovered this fact, whether an inspection reasonable under all the circumstances would have disclosed the probability of danger, were questions involved; and as to these things there was evidence pro et con.  Possibly, the members of this court, if they had been upon the jury which tried the case, would not have come to the conclusion reached by the jury; yet we can not say that the inferences were not issuable.

> " Now, who shall arbitrate?
> Ten men love what I hate,
> Shun what I follow, slight what I receive;
> Ten, who in ears and eyes
> Match me; we all surmise,
> They this thing, and I, that."

Under the law of the land the jury, the "ten men" and two, must, as to these questions, arbitrate; not we.

2.  "The question of damages being one for the jury, the court should not interfere, unless the damages are either so small or so excessive as to justify the inference of gross mistake or undue bias."  Civil Code, § 3803.  This axiom is not so peculiarly applicable to cases of this character, where the law fixes the basis

of the jury's calculations, as in those cases where the limit of enlightened conscience is the only measure; still the rule in a restricted sense exists in these cases also. It is contended by the plaintiff in error that the verdict is manifestly excessive, for if the jury had allowed a recovery at the rate of the deceased's salary as a fireman, $60 per month plus the $15 per month estimated by one witness as the value of the bed, heat, and light furnished him in the fire-engine house (plaintiff in error says that it is not fair to consider this $15, since he, being a married man maintaining a home, got no financial benefit therefrom), for his full life expectancy, according to the Carlisle tables, which were in evidence, it would have lacked $1.40 of reaching the amount actually found. It is further insisted that a man's expectancy of years of earning capacity is necessarily less than his expectancy of life; because it is absolutely certain that the average man (and the tables are based on the life of the average man) loses from his work a certain portion of the years of his life on account of sickness, the infirmities of old age, and similar causes. If the jury were bound by the mortality and annuity tables, the criticism would be well founded. The jurors are permitted to use the tables, but they may disregard the tables and may employ any method known to them as upright and intelligent men. *Central R. Co. v. Wiggins,* 91 *Ga.* 208; *Florida Central R. Co.* v. *Burney,* 98 *Ga.* 1; *W. & A. R. Co.* v. *Cox,* 115 *Ga.* 715 (1); *Central R. Co.* v. *Crosby,* 74 *Ga.* 748 (4); *W. & A. R. Co.* v. *Clark,* 117 *Ga.* 548; *Bussey v. C. & W. C. R. Co.,* 57 S. E. 1015. The jury may easily have concluded that the plaintiff, owing to his good health and good habits, would have had more years, both of life and of earning capacity, than the average man whose life is the subject-matter of estimate in the Carlisle tables. At any rate, the verdict is not so excessive as to indicate gross mistake, if mistake at all.

3. We have carefully examined the complaint as to the excerpt taken from the charge of the court, and we conclude that it is not erroneous; especially when taken in connection with the context. The judge was explaining to the jury the method in which they should use the mortality and annuity tables, in the event they saw fit to use them. He said to them (we quote the excerpt complained of, together with the immediate context): "These

figures I merely give by way of illustration, and you will not confuse them with the actual figures shown by the evidence adduced upon the trial. You will observe that these tables and observations of the court are based upon the assumption that the supposed person would live as long as the average man of that age would live. If, under the evidence, the expectancy would be greater or less than that of the average man, or the earning capacity would increase or decrease, the cash value of the life should be increased or decreased accordingly. In estimating the damages *in this case* [italics ours] you are authorized to consider feebleness of health, sickness, increased infirmities with age, and such other like causes that operate in human experience to *decrease* the earning capacity of a person." We must confess that we are wholly unable to see any injustice or injury done to the plaintiff in error by this charge. "It is simply an explanation of how and *in* what manner the tables should be used, if the jury should consider them at all. It appears to us that the judge is bound, when these tables are introduced in evidence, to explain to the jury how they may be used, just as he should explain a table of logarithms if it were introduced in a case involving questions which that table would illustrate. And so he should explain an almanac introduced to show the phases of the moon or the time of the rising and setting of the sun, etc." *Savannah, Florida & Western Ry. Co.* v. *Austin,* 104 *Ga.* 618. The specific criticism is that "it allows the jury to consider the possibility of increased earning capacity of the plaintiff's husband; while the law does not authorize such recovery, for the reason that the same would be speculative, too uncertain, and too indefinite; also that there was no evidence before the jury that would authorize them to find that the plaintiff's husband's earning capacity would be increased, nor was there any evidence that could authorize the jury to find that his expectancy would probably be greater than that of the average man." We think that when read in its entirety, the charge, instead of allowing the jury to consider the possibility of increased earning capacity, unduly limits the right; for after explaining to them that the tables were based on the expectancy of an average man with a uniform earning capacity, and after showing them that it would be necessary to vary the result in like proportion as the actual facts might warrant a departure from that average, either

on account of increase or dimunition of either the expectancy or the earning capacity, he draws the specific application by saying, "In estimating the damages in this case, you are authorized to consider feebleness of health, sickness, increased infirmities with age, and such other like causes that operate in human experience to *decrease* the earning capacity of a person." We can not believe that any juror of sufficient capacity to grasp an explanation of the tables at all would be led to think that the judge, by the language used, intended that he should consider any likelihood of the increase in the deceased's expectancy or earning capacity. It is in this view that we have said that we thought the charge unduly limited the jury in favor of the defendant, and not against it; for we think that, under the evidence, the jury would have been authorized not only to consider the chances of a decrease of earnings from the causes enumerated by the judge; but also to consider any probability of an increase of his expectancy beyond the average on account of his good health and good habits, as well as an increase of his earning capacity by reason of the fact that he was a young man, of good health, good habits, and of such character and attainments as to warrant his employment and retention in the responsible position he had held, while he was yet in possession of those years in which, common experience tells us, men climb the hill of life's way before they begin to go down. "All men know that in the ordinary course of nature a man is born, grows to maturity, has his meridian, grows old, with waning powers, and dies." *Southern Ry. Co. v. Scott, 128 Ga. 247, 57 S. E. 504.* In *Georgia Cotton Oil Co. v. Jackson, 112 Ga. 620,* as well as in the *Scott* case, supra, it is held that "a charge instructing the jury to take into consideration and give the proper effect to any evidence before them, if there be such, tending to show that there was a reasonable prospect of increased earnings on the part of the plaintiff in case he had not been injured, should not be given, where there is no evidence to warrant it." These two cases are cited by counsel for plaintiff in error to sustain their attack upon the charge. If the proper distinction existing between "earnings" and "earning capacity," and between "prospects of increased earnings" and "probabilities of an increase of earning capacity," be kept in mind, it will be seen that the charge in question does not violate the inhibition of the authorities cited; even

if it is conceded that the charge is fairly capable cf being construed as submitting to the jury the right to consider any increase of earning capacity shown by the evidence. The damages are given on account of destruction of earning capacity; evidence of actual earnings is received for the purpose of illustrating what the earning capacity is or probably will be. *Richmond & Danville R. Co.* v. *Allison,* 86 *Ga.* 149. It is error to admit prospects of advancement to a position of which the person in question has no definite assurance; but, to quote from the language of Mr. Justice Brewer in Richmond & Danville R. Co. *v.* Elliott, 149 U. S. 266, cited approvingly in the *Scott* case, supra, "of course there are possibilities and probabilities before every person, particularly a young man, and a jury in estimating the damage sustained will doubtless always give weight to those general probabilities as well as those springing from any peculiar capacities or faculties." Possibly we can make the exact distinction we are seeking to draw clearer by having recourse to the example proposed by Chief Justice Simmons in the *Allison* case, supra. After saying (86 *Ga.* 152), "While it is proper in cases of this kind to prove the age, habits, health, occupation, expectation of life, ability to labor, and probable increase or diminution of that ability with lapse of time, the rate of wages, etc., and then leave it to the jury to assess the damages, we think it improper to allow proof of a particular possibility, or even probability, of an increase of wages by appointment to a higher public office, especially where, as in this case, the appointment is somewhat controlled by political reasons;" and in support of the proposition he cites the following example: "The deputy-clerk of this court is very efficient and faithful, and if there should be a vacancy in the office of clerk of the court, it is not only possible, but very probable, that he would be appointed to fill the vacancy, thereby obtaining a much larger salary than he now receives; but if he should be injured, as Allison was, and were to sue the railroad company for damages, we do not think it would be competent for him to prove the possibility or probability of his appointment to fill a vacancy in the office of clerk, especially as the *personnel* of the court, upon which such appointment must depend, might change in the meantime. To allow the jury to assess damages in behalf of the plaintiff on the basis of a large income arising from a public office which he has never re-

ceived and which is merely in expectancy and might never be received, or if received at all might come to him at some remote and uncertain period, would be wrong and unjust to the defendant." This opinion was written and this example given over seventeen years ago. Time, as to the very example given, has justified the soundness of the proposition stated. The then efficient and faithful deputy-clerk of the Supreme Court has not yet become the clerk of that court, because the kindness of Providence has preserved the loved and faithful clerk, so that a vacancy has never arisen; and it is the hope of the bench and bar of the State alike that the present hardiness of health of that most esteemed official will ward off, for a long time, the day when the vacancy must occur. So that if the deputy referred to had been injured and, to enhance recovery of damages, had sought to prove this contingent expectancy, and the court had allowed it, it would have (as time has demonstrated) given him the benefit of a prospect of earnings which has not become a reality. On the other hand, in such a suit it would have been perfectly proper for him to have proved and for the jury to have considered (and therefore have inferred a probability of an increase of earning capacity) the fact that he was a young man of good habits, good health, and good name, and that he was then capable of filling efficiently and faithfully a responsible position. And time has justified the wisdom of this rule as applied to the example given, for although the deputy referred to has never become the clerk of the Supreme Court, still those very qualities of efficiency and fidelity, the good name and capacity for the filling of responsible office, led the Judges of this court, upon its organization, to choose him as its clerk at the same salary he would receive if he were clerk of the Supreme Court. Mr. Justice Lumpkin, in the *Scott* case, supra, points out certain instances in which prospects of earnings, being definite and not wholly contingent, may be shown to the jury and considered by them along with such general probabilities of an increase of earning capacity as the proof of the person's age, character, health, habits, etc., may indicate. In such cases the court may charge the jury on both prospects of increased earnings and probabilities of increased earning capacity. In cases, such as the one at bar, where there is no evidence of a definite, reasonably certain prospect of increase of earnings, but there is evidence as to the age,

health, habits, etc., of the person, from which the jury may reasonably infer an increase of earning capacity, the judge should not submit to the jury any instruction by which they would be authorized to consider prospects of earnings, but may properly charge them upon their right to consider the probabilities of an increase of earning capacity. This disposes of all the assignments of error.                    *Judgment affirmed.*