32351, 32360. WESTERN & ATLANTIC RAILROAD CO. *v.* WRIGHT, administratrix; and *vice versa.*

DECIDED JUNE 22, 1949. REHEARING DENIED JULY 27, 1949.

*Walton Whitwell, J. G. B. Erwin,* for plaintiff in error.
*Isaac C. Adams,* contra.

PER CURIAM. ■ The court did not err in overruling the motion to dismiss the defendant's motion for a new trial. The motion for a new trial was sent to the attorney for the plaintiff in the court below for acknowledgment of service. The attorney struck from the form acknowledgment and waiver the following words, "time, copy and all other and further service waived." The following acknowledgment was signed: "Due and legal service of the within motion and order acknowledged. This 11th day of March, 1948." The trial judge certified by note in the cross-bill of exceptions that the trial term of the court had not adjourned at the time the bill of exceptions was signed nor on the date when it was filed. Furthermore, after the plaintiff below had made a motion to dismiss the motion for a new trial her attorney signed the approval of a brief of the evidence, in which there was an agreement that it be filed as a part of the record in the case. In connection with the certification of the cross-bill of exceptions, the judge made the following note: "During the hearing of the motion to modify the order of continuance granted August 20th, 1948, and the motion to dismiss the motion for new trial and before any order was entered thereon, J. G. B. Erwin, of counsel for movant, stated in open court that some days prior to the entering of the consent order of August 20th, 1948, continuing the hearing of the motion for new trial to October 15th, 1948, Mr. Adams, counsel for the respondent, called him over the telephone and stated that unless he was furnished with a copy of the amendment to the motion for new trial 2 or 3 days before the hearing set for August 20th, 1948, that he would not be ready for the hearing at that time; that he told Mr. Adams that Mr. Whitwell was preparing the amendment, but that he would write Mr. Whitwell and ask him to write Mr. Adams whether he could furnish him with a copy of the amendment as requested; that on the following day, he received a letter from Mr. Adams to the effect that unless he was furnished a copy of the amendment to the motion by August 13th, 1948, he would not be ready for the hearing on August 20th, as he was going on his vacation and it would require some time for mail to reach him; that he mailed this letter to Mr. Whitwell and requested Mr. Whitwell to write Mr. Adams in reply, in due course, received a copy of a letter from Mr. Whitwell to Mr. Adams advising Mr. Adams that he

could not furnish him a copy of the amendment by August 13th, 1948, and, also received a copy of a letter from Mr. Adams to Mr. Whitwell advising Mr. Whitwell that he would not be ready unless he was furnished with a copy of the amendment by August 13th, 1948; that acting on this telephone conversation and these letters, he prepared and took the consent order of August 20th, 1948, continuing the hearing of the motion to October 15th, 1948.

"Mr. Erwin further stated that he sent the motion for new trial to Mr. Adams for acknowledgment of service, and in about a week later received it by mail, and seeing that Mr. Adams had acknowledged service, filed it, not noticing that Mr. Adams had hyphened out a portion of the acknowledgment of service.

"The February term, 1948, of Gordon Superior Court had not adjourned when the motion for new trial was presented and filed.

"The court further took into consideration the fact that Mr. I. C. Adams, counsel for respondent, called the court over long-distance telephone and stated that the movants in their original motion would not, he understood, have their amended motion ready for a hearing in time for him to study it before going on his vacation, and would probably ask for a continuance; that he did not ask for a continuance or wish to be in the attitude of agreeing to a continuance; but that it would suit him better if the hearing was continued until after he returned from his vacation. It was upon consideration of all the above facts that the court overruled the motion to dismiss the motion for new trial." There was an order of continuance of the hearing on the motion for a new trial, which recited that it was signed by consent of counsel. The attorney for the plaintiff below moved that the order be modified so that it would show that it was signed solely at the instance of the railroad. As we understand the issues, the motion to modify had as its purpose the removal of the order as a waiver of lack of service of the motion for a new trial, and not for the purpose of having the case sent back for the sole purpose of having the motion argued again before the trial judge. Inasmuch as it is otherwise immaterial, under the rulings above, no ruling will be made on the motion to modify the order.

■ The first ruling assigned as error is the action of the court in overruling the defendant's written motion to dismiss the peti-

tion, in the nature of a general demurrer. This motion was filed upon the call of the case for trial and after the allowance of the plaintiff's amendment setting up "that the suction of the swiftly-moving train drew the deceased into the side of said train as it was passing him at said time." As stated in the brief of counsel for the defendant, the petition as amended sought recovery upon the theory that the deceased was killed while trying to enter a camp car on a sidetrack of the defendant's main-line track by being sucked into the side of a freight train passing the several camp cars, at a speed of 60 miles per hour, in violation of a city ordinance limiting the speed of trains to 25 miles per hour, without signaling by bell or whistle the approach of the train; without the engineer maintaining a constant and vigilant lookout along the track ahead as the train approached said camp cars; without having the train under proper control; in failing to anticipate the presence of the deceased at the side of one of the camp cars in a hazardous place between the sidetrack and the main line; in placing the camp cars on its sidetrack at the place where they were located, and in such manner that cars north of the car deceased was trying to enter cut off his view of the approaching train from the north on the main-line track, because the sidetrack "curved rather sharply to the east as it connected with said main line."

The defendant contends that the case should have been dismissed on its motion in the nature of a general demurrer, under the ruling in *Southern Railway Co.* v. *Young*, 20 *Ga. App.* 362 (93 S. E. 51). The facts in the *Young* case are so far different from the facts as set out by the allegations in this case, that we do not think that the ruling therein is applicable here. In the *Young* case, the injured person was expecting a train, he had heard it blow and knew it was approaching, and he saw its headlight and still remained so close to the track, although there was nothing to prevent his removal a safe distance from the track, that he was hit by the train. In the instant case, it was alleged that the deceased did not know of the approaching train, that the track curved sharply 100 yards north of the camp car he was undertaking to enter, "cutting off his view of the approach of trains from the north," and that he did not see or hear any trains. Another distinction in the *Young* case and the case at

bar is the fact that the deceased in the instant case was alleged to have been between the camp cars and the moving train (the space between the camp cars and the train being a little more than four feet), and was hemmed in, so to speak, in such a manner that he could not retreat or otherwise retire from his perilous position. Furthermore, the speed of the train in the instant case was alleged to have been 60 miles per hour, whereas the speed of the train in the *Young* case was first alleged as between 15 and 20 miles per hour, and by amendment as between 30 and 35 miles per hour.

We do not think that this court can say as a matter of law that no suction was probable or possible under the situation alleged in the petition, or that the deceased should necessarily have known as much about suction under such circumstances as the employees in charge of the operation of the train. The plaintiff alleged suction as a consequence resulting from the rapid speed of a train in close proximity to a string of camp cars, and we think there is a vast difference between the possibility of suction under the circumstances here alleged and the circumstances appearing in the *Young* case. The case of *Moore* v. *Seaboard Air-Line Ry. Co.*, 30 *Ga. App.* 466 (118 S. E. 471), which is also cited and relied on by the defendant, is not in point because of its most unusual and extraordinary state of facts. It may be noted also that neither the *Young* case nor the *Moore* case holds, as a matter of common knowledge, that no suction is possible as a result of a swiftly-moving train in close proximity to a string of cars on an adjacent sidetrack. The court did not err in overruling the motion in the nature of a general demurrer to dismiss the petition.

■ Grounds 4 through 9 of the amended motion for a new trial assign error on various charges of the court which authorized the jury to find that the employee was an invitee at the time he was killed. The evidence clearly authorized the finding that he was an invitee at that time, and none of the grounds shows any material error.

■ That there is no suction toward the side of a moving train has not been scientifically established, and it was not error to refuse a request to charge that such a fact is true. Special ground 10 is without merit.

■ The court did not err in refusing to charge the following request: "I charge you that it was the duty of the defendant to maintain a vigilant lookout ahead down the track in front of his locomotive, but he was not required to be looking otherwise than ahead for any person that may have been in a place of safety clear of the sweep of the train to the side of the track." This request was inapplicable for the reason that the act of looking ahead by the engineer and fireman would have revealed one who was standing immediately adjacent to the tracks, and it would not have required a looking to the side to see him.

■ Special ground 12 complains of the refusal to charge the following request: "I charge you that the defendant contends that it was not guilty of any negligence causing or contributing proximately to the cause of the injury and death of the deceased and that the proximate cause was his own act of voluntarily stepping or falling into the side of the train as it was passing. If this hypothesis is supported by material evidence and is as consistent with the cause of the injury as that sought to be established by the plaintiff, there can be no recovery and your verdict must be in favor of the defendant." This ground is without merit for the reason that there was no evidence that the deceased voluntarily stepped or fell into the side of the train as it was passing.

■ It was not error to refuse to charge the following request: "I charge you that the construction of a railroad yard is an engineering problem in which a permanent situation is presented, and there is no rule of law which restricts railroad companies to any particular method of erecting or maintaining their tracks. An employee who is familiar with or should be familiar with such physical facts by the exercise of ordinary care assumes all ordinary risks of injury resulting therefrom, as well as the risks of injury from such situation, if any, which is obviously dangerous. In the case now before the court, I charge you that, if you find from a preponderance of the evidence that at the place where plaintiff's intestate met his death the tracks were close enough together and the physical situation was dangerous to a person located between the train and camp cars located on the side track, and said condition caused or contributed directly to the cause of the death of plaintiff's intestate, he would be held

to have assumed the risk of such dangerous situation, if any." This request does not state a correct principle of law as applied to a situation where a person is standing far enough away from a train not to be hit by it unless some other force, such as suction, comes into play. A majority of the court hold that the jury, under sufficient evidence, would be authorized to find that such a force could operate to draw a man into a train where he is standing between the moving train and cars on an adjacent track. In such a situation it would be a jury question whether the railroad should anticipate the danger of one it should anticipate was so situated, and exercise ordinary care to avoid injuring him.

■ Special ground 14 complains of the refusal to give a requested charge to the effect that, if the jury found for the plaintiff, it must take into consideration the condition of the plaintiff's health as well as that of the deceased, at the time of his death, in arriving at the period of time in the future that she may have been expected to receive support from the deceased if he had lived. The refusal to give the request was not error because the plaintiff's health at the date of the death of the employee is immaterial. Her health at the time of trial would be. Furthermore, there was no evidence in the record from which the jury could find the expectancy of the plaintiff except that she was under the care of a doctor at the date of the employee's death. *Atlantic Coast Line R. Co.* v. *McDonald*, 50 *Ga. App.* 856 (179 S. E. 185). The refusal to give this requested charge was not error.

■ Special ground 15 complains that the verdict was excessive. This ground is meritorious. The plaintiff's action was not for the full value of the life of the deceased, but only for her interest in the life, based on his monthly contributions. The highest monthly contribution proved was $40. The evidence did not authorize a finding that it would be increased to any appreciable extent. The deceased at the time of his death was 37 years of age. The verdict rendered by the jury, for $20,000, was due to bias and prejudice or gross mistake. This amount indicates that the jury found an expectancy much greater than is ever attained in modern times or contributions much larger than authorized by the evidence. The fact that the plaintiff wrote off $10,000 from the verdict before the motion for a new trial was

passed on does not have the effect of eliminating the defect in the original verdict. If any excess was given because of bias or prejudice or gross mistake, so might the whole have been given. The voluntary writing off of a part of the verdict does not obviate a reversal where the appellate court can hold that the verdict as originally rendered is so excessive as to lead the court to suspect bias or prejudice or gross mistake. *Seaboard Air-Line Ry. Co. v. Randolph,* 129 *Ga.* 796 (59 S. E. 1110), and cases cited. Neither the judge nor the plaintiff can fix the amount of a verdict in such cases.

█ As the case must be tried again the general grounds of the motion for a new trial will not be considered.

The court erred in overruling the motion for a new trial.

Pursuant to the act of the General Assembly approved March 8, 1945 (Ga. L. 1945, p. 232, Code, Ann. Supp., § 24-3501), requiring that the full court consider any case in which one of the judges of a division may dissent, this case was considered and decided by the court as a whole.

*Judgment affirmed on the cross-bill of exceptions, and reversed on the main bill. Sutton, C. J., Gardner and Worrill, JJ., concur. Felton, J., concurs specially. MacIntyre, P. J., concurs in all of the majority opinion except division 9, from which he dissents. Townsend, J., disqualified.*

FELTON, J., concurring specially. I think that the court erred in overruling the motion to dismiss the action. The original petition alleged that the main-line track was separated from the sidetrack only sufficiently to permit cars to pass on said tracks without striking each other, and that, while the deceased was attempting to enter one of the camp cars on the sidetrack, he was hit by a southbound train operating on the main line. Under this original petition it is clear that the negligence relied on for recovery was: (1) stationing the camp cars so close to the main-line track, (2) placing the camp cars so that employees could enter only from the east side, next to the main-line track, (3) failure to warn the deceased, (4) excessive speed, and (5) failure to keep a lookout ahead, etc. By amendment the petition alleged that the deceased was sucked into the side of the train. This amendment had one of two effects: it changed the purported cause of action from the one originally alleged into one

based solely on the theory that there was room enough between the train and the cars for deceased to stand, and that the passing train sucked him into its side; or it sought to add a second cause based on the suction theory, in addition to the original cause. Whether two causes of action were attempted or only one, the action should have been dismissed on the motion in the nature of a general demurrer. If the petition attempted to state two causes of action, as it was amended, the cause of action based on the theory that the camp cars were so close to the main line that a train on the main line could barely pass without striking the camp cars, the deceased knew the situation as well or better than anyone else, and he was guilty of the grossest kind of negligence in attempting to enter a camp car when a train was approaching on the main line when he did not have time to enter safely before the train arrived. The view that the petition sought to set forth two theories of the death is held only by the writer. The majority of the court hold the opinion that the amended petition seeks to recover on the suction theory alone. Since the majority so rule, the only authoritative ruling that this court may make is on the suction theory. Under the ruling in *Southern Railway Co.* v. *Young,* 20 *Ga. App.* 362 (93 S. E. 51), the petition does not set forth a cause of action on the theory that the deceased was sucked into the side of the train. The petition as thus construed shows that there was standing room between the train and the camp cars, and that the only alleged actionable negligence was the failure to warn the deceased and the excessive speed of the train. In the *Young* case, supra, it was held: "As suggested in the brief of able counsel for the plaintiff in error, the theory that the injury resulted from the fact that the plaintiff was sucked under or against the engine or cars must be regarded from one of two standpoints, to wit: either this happening was likely to occur under the circumstances alleged to have existed at the time and place of the injury, in which event a man of ordinary prudence would be bound to guard against; or it was an unusual and extraordinary occurrence [which was] not likely to happen, and which a man of ordinary prudence would not be bound to guard against. If it was something likely to happen, the plaintiff himself should have been on guard against the occurrence, as it was the result of a

natural law which would be consequently a matter of common knowledge. If the occurrence was not likely to happen and was unusual and extraordinary, the defendant company could not be charged with negligence in not making an effort to stop the train after those in charge of it saw or could have seen the plaintiff walking by the side of the track, but not near enough to it to be struck by the passing engine or cars. If, under the operation of natural laws, those in charge of the train should have anticipated that the plaintiff would probably be sucked under, in, or close up to, or against the train, then the plaintiff would likewise have been bound to anticipate the same result. And if the accident was unusual and extraordinary, and the plaintiff in the exercise of ordinary care and diligence for his own safety could not have anticipated such result, neither could those in charge of the train be expected to anticipate this result." See also *Moore* v. *Seaboard Air-Line Ry. Co.*, 30 *Ga. App.* 466 (7) (118 S. E. 471). We are bound by the *Young* decision, supra, until it is overruled. I do not think that the *Young* case is distinguishable in principle from this case. In the *Young* case the injured person was expecting the train. In this case he was standing beside the train while the engine and several cars passed by him. The deceased had to know the train was there and warnings wouldn't have helped him one bit. The presence of the camp cars makes the questions more difficult and complex. The principle of who was bound to know what is the same. The greater speed in this case is irrelevant. The court in the *Young* case was ruling on the principle of suction, and treated it as being a fact even at 30 to 35 miles an hour. If the court in the *Young* case had ruled that there is no suction at 30 to 35 miles an hour there might be some basis for saying it is distinguishable.

I concur in the other rulings and the judgment.

ON MOTION · FOR REHEARING.

MacINTYRE, P. J., dissenting. I concur in all divisions of the majority opinion except division 9, from which ruling I dissent. In paragraph 25 of the original petition it is alleged: "That petitioner's brother was a strong and able-bodied man 37 years of age, who had a reasonable expectancy of 29.64 years, and was capable of earning the sum of $125 to $130 per month as bridge

gang workman; that with increasing years and added experience his earning capacity should have increased to at least $175 per month, or other large sum." By amendment the figures "29.64" in paragraph 25 were struck and "at least 40" was inserted. On the trial Mrs. Mamie Wright testified: "I am a sister of the late Oscar Petty . . at the time of his death he made his home with me. He worked on the Western & Atlantic Railroad. . . My brother was not married. Neither one of his parents were living at the time he was killed. . . My husband is not living, he is dead; he has been dead about eleven years. . . At the time that my brother was killed, he had been making contributions to my support all along. At the time he was killed, as to how much he was contributing to me per month, well, he just lived there as one of the family, and I never thought of keeping up with anything like that; he was just like the man of the house, when he seen I needed anything like that; he would get it, and he paid me so much, I say $40, and it might have been more than that if I had just kept up with it. I wasn't keeping books on it. . . At the time that my brother died, as to whether or not I know approximately how much he was making per month as an employee of the defendant, well, he was making around $175 or $180, I think it was, I seen his checks several times, I don't know exactly what; I seen two of his checks after he was killed. . . As to how much I averaged making per week, the high and the low, well, $11 or $12, I don't remember, because I would get to work more some weeks than I did others. I said I was under the care of a doctor, and I had doctor bills to pay. Yes, I have a family and was maintaining a home at the time my brother was killed. I did not have any other income other than the work I was able to do myself and the contributions that my brother made to me." According to certain payroll checks and data introduced in evidence, the average monthly wages of the deceased, Petty, for the period from January to June were approximately $129.70. According to the employee's withholding exemption certificate filed with the employer, he claimed exemptions from taxation of his income for two persons, in that he furnished more than one-half the support of those two persons. No mortality tables or annuity tables were introduced in evidence, and the court charged the jury: "On the

other hand, if upon consideration of the case at this point you decide that the plaintiff is entitled to recover, you would go further and determine how much the plaintiff is entitled to recover, and I charge you, gentlemen, in that connection, that the plaintiff in this case, if you find that Oscar Petty was her brother, and that he contributed to her support, and that she was dependent upon him, then your verdict would be conditioned upon how much contributions he made to her support, to what extent and how much this contribution was to her support. In other words, she would not be entitled to recover for the full value of his life, but would be entitled to recover whatever her pecuniary loss is by reason of the death of her brother. In that connection, you would look to the age of her brother, his health, his habits, his ability to earn money, the amount that he earned, and you will take into consideration that people do not work every day of their life, frequently in old age their earning capacity becomes impaired, and you would take into consideration how much he contributed toward the support of his sister, how long he would have been in position on account of his age and his physical strength and earning capacity to have contributed to her support. You would determine how much she would be entitled to recover on that basis, and having done that, it would then be your duty to reduce to its present cash value, and the way you do that would be what is known as the seven percent interest rule, reduce the gross amount she would be entitled to recover for year after year during his expected life down to its present cash value, being the seven percent per annum interest rule."

It seems to me that the jury was authorized to find or infer that the deceased was acting as the head of his sister's family, and that in addition to what his sister earned and what he regularly contributed to her, the deceased, within the limits of his earnings, had furnished anything that was reasonably necessary for the support of his sister's family from his earnings from the railroad company. It also seems to me that the jury would have been authorized under the evidence to find that the brother's life expectancy was greater than that of the average man, that his earning capacity would increase, and that he would, as his earnings increased, increase his contributions to his sister, there-

by making the total pecuniary loss to her by reason of his death proportionately greater. *Central of Georgia R. Co.* v. *Minor*, 2 *Ga. App.* 804 (59 S. E. 81). Under the evidence and the charge of the court as given, the jury was not required to use the annuity tables, and in passing on the amount to be allowed the plaintiff (if they found for her), and the jury may, as indicated above, employ any method known to them as upright and intelligent men which is just and fair in estimating the damages. *Central Railroad & Bkg. Co.* v. *Wiggins*, 91 *Ga.* 208 (18 S. E. 187). The verdict in this case is the second award by a jury of a verdict for the plaintiff in the amount of $20,000. On the former trial the trial judge himself granted the new trial on account of an error in his charge. We thus have the damages fixed at $20,000 by two juries, and the verdict has the approval of the trial judge in the present case. There is no contention that there was anything to show bias and prejudice on the part of either jury except what the defendant claims is the excessiveness of the verdict. I do not think that the verdict should be upset on the ground that it shows bias and prejudice; and if this be correct, the mere voluntary writing off of part of the verdict by the plaintiff is not itself a ground for reversal, where it does not appear that this was done on the suggestion of the trial judge or that his refusal of the new trial was influenced by the reduction of the verdict. *Bugg* v. *Harper*, 36 *Ga. App.* 39, 40 (135 S. E. 109). I do not think that the motion for new trial should be granted on the ruling made in division 9 of the majority opinion, and I think that the motion for rehearing should be granted.